**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FEDERAL CARBIDE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:15-cv-248 |
| EXETER CONSTRUCTION, LLC., and | ) |
| DENNIS B. BALLARD, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff, Federal Carbide Company ("FCC") files the following Complaint against Exeter Construction, LLC ("Exeter") and Dennis B. Ballard ("Ballard"; collectively, the "Defendants") and states as follows:

## OVERVIEW

1. Ballard represented to FCC, among other things, that he and his company, Exeter were experts in the design and construction of manufacturing facilities, that he and Exeter had done similar jobs, that he and Exeter were qualified to manage all elements of the design, procurement and construction of a manufacturing facility, warehouse space and office space for FCC to manufacture Tungsten Carbide and Tungsten Heavy Alloy components near Tyrone, Pennsylvania (the "Project"), and FCC would be able to focus on its business instead of the details of the construction project if FCC hired Ballard and Exeter for the Project.

2. As such, FCC contracted with Exeter to serve as its general contractor to manage all elements of the design, procurement and construction of the Project.

3. However, contrary to Ballard's representations, Ballard and Exeter were not qualified for the Project. Neither had ever designed and constructed a facility such as the Project. Indeed, Exeter is essentially only Ballard and has no other employees.

4. Soon after beginning the Project, Exeter began causing significant damage to FCC and significant delay to the Project by being unprepared, not complying with the contract, improperly abandoning the Project, failing to pay subcontractors and performing defective work. The Project fell far behind schedule. Rather than remedy its defective and late work, Ballard and Exeter engaged FCC with socializing and lewd text messages.

5. FCC was left with no choice but to terminate the contract on July 28, 2015. Immediately after being terminated, Exeter and Ballard began attempting to sabotage and shut down the Project, by among other things, threatening subcontractors to convince them not to work with FCC and destroying needed permits, drawings and specifications related to the Project rather than returning such documents to FCC as they were obligated.

6. As a result of Exeter's and Ballard's acts and omissions, FCC has already spent, and anticipates spending, substantial sums to remedy and/or replace the defective construction work. Through this lawsuit, FCC seeks recovery of: (i) the significant compensatory damages it has incurred as a result of Exeter's defective and incomplete work and breaches; (ii) delay on the Project pursuant to an agreed-upon liquidated damages provision; (iii) attorneys' fees pursuant to an agreed-upon attorneys' fee provision; and (iv) punitive damages as the result of Defendants' malicious, willful and fraudulent conduct.

## PARTIES

7. Plaintiff, Federal Carbide Company, is a New Jersey corporation with its principal place of business located at One Eagle Ridge Road, Tyrone, Pennsylvania 16686.

8. Defendant, Exeter Construction, LLC, is a Delaware limited liability company having its principal place of business at 415 S. Carter Road, Smyrna, Delaware 19977.

9. Defendant, Dennis B. Ballard is a resident of Delaware with a last known address of 415 S. Carter Road, Smyrna, Delaware 19977.

## JURISDICTION AND VENUE

10. Plaintiff brings its complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

11. This Court has personal jurisdiction over Defendants because, *inter alia*, they have transacted, and will be transacting, business in this State and have caused harm or tortious injury in this State by acts within this State.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because, *inter alia*, a substantial part of the events giving rise to these claims occurred in this judicial district.

## FACTUAL BACKGROUND

**A.    Ballard Falsely Represented to FCC that it is Qualified to Manage All Elements of the Design, Procurement and Construction of the Project.**

13. FCC is a world leader in the manufacture of Cemented Tungsten Carbides and Tungsten Heavy Alloy components.

14. FCC maintains a fully integrated manufacturing complex in Tyrone, Pennsylvania.

15. Because FCC's operation in Tyrone was experiencing rapid growth, in or around 2014, FCC decided to build a new integrated manufacturing facility with warehouse space in Tyrone (the "Project").

16. In or around August 2014, FCC approached Defendants regarding their ability to manage all elements of the design, procurement and construction of the Project.

17. FCC informed Defendants that it desired a hands-off construction project with a general contractor that could effectively manage all elements of the design, procurement and construction of the Project so that FCC could maintain its focus on its rapidly expanding manufacturing business.

18. FCC informed Defendants that swift completion of the Project would be critical to FCC's operations.

19. With this understanding, in or around August 2014, Ballard represented to FCC's executive, David Avedesian, among other things, that Defendants were experts in construction projects like the Project, Defendants could manage all elements of the design, procurement and construction of the Project, Defendants could complete the Project in a timely manner, Defendants had heavy construction equipment to work on the Project and that if FCC hired Defendants, it would be able to focus on its business instead of the details of the construction of the Project.

20. In or around August 2014, Ballard represented to Mr. Avedesian that Exeter had heavy construction equipment, such as bulldozers, that it would devote to the Project.

21. Around this same time, Ballard also represented to Mr. Avedesian that Exeter had employees that it would devote to the Project.

22. In or around August 2014, Ballard provided Mr. Avedesian with a document representing that Exeter had served as the full service general contractor for several projects described in that document.

23. In or around August, Ballard represented that Exeter had completed several

design and build projects at Dover Air Force Base on time and on budget.

24. For instance, Ballard represented that Exeter had completed a $3.5 million project at Dover Air Force Base which involved Exeter completely remodeling supply building #639 to include a roofing system, wall systems, exterior doors, overhead doors and interior fit-out of two new offices.

25. Defendants made these representations with the intent to induce FCC to enter into a contract with Defendants.

26. FCC relied upon these representations and would not have entered into the Contract absent such representations.

27. These representations were false.

28. Exeter did not complete the Dover Air Force Base Project as he represented.

29. In fact, publicly available information shows that Exeter is not a registered federal contractor and that Exeter has not had any federal contract, let alone a contract at Dover Air Force Base.

30. In reality, Exeter had not previously managed the design, procurement and construction of a project like the Project.

31. In fact, Exeter was not a full service general contractor at all.  It was simply a shell company comprised of Ballard as its only employee.

32. Exeter did not have equipment Ballard represented it did.

33. Exeter was understaffed, undercapitalized and unable to serve as full service general contractor for the Project.

34. At no time did Defendants inform FCC that they had not previously managed the design, procurement and construction of a project like the Project.

35.     Nor did Defendants ever inform FCC that Exeter was not a full service general contractor and that it was essentially a shell company comprised of Ballard.

**B.      Exeter Agreed to Design and Build the Project Within 200 Days Pursuant to the Terms of a Contract with FCC.**

36.     As a result of Defendants' representations, FCC entered into a "Design-Build Agreement for Engineering, Procurement and Construction Services" with Exeter on or around September 11, 2014 (the "Contract").  See Exhibit A, Contract.

37.     FCC would not have entered into the Contract had it known Exeter and Ballard did not have the experience, employees and construction equipment that it claimed it had.

38.     In the Contract, Exeter agreed to provide "all engineering and design, procurement, construction, erection, installation, construction management, training assistance, the provision of all materials, Equipment, machinery, tools, transportation, administration and other services" for the Project on a fixed cost basis.  Exhibit A, Contract at Article 1.71 &  4.2.

39.     In the Contract, Exeter represented that it had "all the required authority, ability, skills, experience and capacity necessary to perform and shall perform the Work in a timely and professional manner, utilizing sound engineering principles, project management procedures, construction management procedures and supervisory procedures to perform the Work in accordance with Industry Standards and Applicable Laws." Exhibit A, Contract at Article 5.1.1.

40.     Exeter also agreed that the construction and design of the work would be "free from defects."  Exhibit A, Contract at Article 15.1.1.

41.     Exeter also agreed that it would "[o]btain, maintain and pay for all" permits required for the Project.  See Exhibit A, Contract at Article 1.4 &  4.5.

42.     Exeter also guaranteed that the Project would reach Substantial Completion by no later than two hundred (200) Calendar Days after the Notice to Proceed.  See Exhibit A, Contract

at Article 1.68.

43. Because FCC would experience significant damages that were not readily quantifiable if Exeter did not complete the Project within two hundred days, the parties agreed to a provision that imposed liquidated damages of $1,500 per day for each day Exeter failed to achieve Substantial Completion. See Exhibit A, Contract at Article 13.1.

44. FCC issued a Notice to Proceed to Exeter on September 11, 2014, requiring Substantial Completion by March 30, 2015 (the "Completion Date").

45. On that same date, FCC provided Exeter with a $50,000 deposit check.

C. **Exeter Immediately Attempted to Avoid Contractual Requirements and Failed to Obtain and Pay For Necessary Permits in a Timely Manner.**

46. Almost immediately after FCC issued the Notice to Proceed, Exeter began breaching its contractual obligations.

47. Exeter failed to provide FCC with a list of all its anticipated subcontractors within ten days after the Contract effective date as required by Article 10.1 of the Contract. As such, FCC never had the opportunity to object to any of Exeter's subcontractors before Exeter and its subcontractors began work on the Project.

48. Also, Exeter failed to timely obtain and pay for the necessary permits for the Project.

49. For instance, Exeter prepared a faulty "site plan" for the Project which lacked a "soil and erosion control" plan for the Project and failed to submit the required plans to local authorities, namely Blair County.

50. Also, Exeter never sought approval for a new commercial driveway from the Pennsylvania Department of Transportation.

51. Moreover, Exeter never completed the necessary permit filings with the Water

Authority and Sewer Authority for the Project.

52. Additionally, FCC was forced pay over $20,000 directly to Snyder Township and to Bureau Veritas in Huntington, Pennsylvania for permits, even though Exeter invoiced FCC and FCC paid Exeter $10,000 to obtain permits.

D. **Exeter Rendered Negligent, Defective and Untimely Work on the Project that Caused Substantial Delay.**

53. In addition to its failure to comply with the Contract's permitting provisions, Exeter's work on the Project was defective in numerous material respects.

54. For instance, FCC was forced to pay over $50,000 directly to the electric company because Exeter designed a deficient subterranean electrical power supply for the Project.

55. Also, Exeter damaged steel sheeting while removing it from a vendor's truck and never made any attempt to replace the damaged goods.

56. Exeter also failed to properly inspect materials received at the site and failed to reject and/or replace steel materials that were not suitable for use at the Project. In particular, Exeter failed to properly inspect, reject, and/or replace mismatched corrugation siding that was delivered to the site in April 2015.

57. Exeter conducted negligent work on drainage areas at the Project and developed a defective soil erosion plan which caused damage to FCC's property and delayed work on the Project.

58. Exeter's defective work and numerous breaches of its contractual obligations caused substantial delay to Project.

59. For instance, despite consistently being paid in a timely fashion by FCC, throughout the Project, Exeter repeatedly failed to pay its subcontractor and vendors as its debts

became due.

60.     Exeter's failure to pay its subcontractor and vendors substantially delayed the Project and forced FCC to directly pay Exeter's suppliers and vendors substantial sums to try to ensure the Project continued in a timely manner.

61.     As the result of Exeter's breaches and its inability to manage the Project, the Project fell far behind schedule.

62.     For various periods of time throughout the Project, Exeter abandoned the Project and no work was performed on the Project.

63.     Indeed, by the Contract's Completion Date of March 30, 2015, the Project was far from being completed; site preparation had not been completed and the concrete foundation had not been poured.

64.     Nonetheless, Ballard ignored the problems and instead engaged FCC's executives by among other things, socializing and sending them inappropriate text messages, including lewd photographs of his wife.

65.     Indeed, Ballard was in no hurry to complete the Project and instead seemed to move into the State College area, including his nearly daily socializing with women at local bars and even joining a local country club despite the fact that his permanent home is in Delaware.

E.     **FCC Was Forced to Terminate Exeter Due to Its Default.**

66.     By July 2015 (approximately two months after the Completion Date), the Project was way behind schedule and was not even close to achieving Substantial Completion.

67.     Around that time, steel trusses on the Project were rusting because they had been lying on the ground for months and not yet been painted as a result of Exeter's failure to prosecute the work in a timely manner.

68. In an attempt to make progress on the Project, FCC even offered to Exeter to have FCC's employees complete certain painting work on the steel trusses. Exeter failed to accept FCC's offer.

69. Beginning on or around July 14, 2015, Exeter once again abandoned the Project so Ballard could go to Las Vegas and shut down work on the Project.

70. Exeter dismissed its steel subcontractor and no subcontractors were scheduled for the foreseeable future in July and August.

71. On July 28, 2015, FCC provided Exeter with written notice that it was terminating the Contract for default (the "Termination Letter").

72. Among other things, the Termination Letter set forth FCC's intent to hold Exeter fully responsible for all damages incurred by FCC as a result of Exeter's negligent, defective, and/or incomplete work.

73. The Termination Letter demanded that Exeter deliver to FCC "all information, Required Manuals, Contractor Deliverables, documents, patents, licenses of Contractor related to the Work, Drawings, Specifications and Contract Deliverables (whether completed or not) that FCC will need to complete the Work" (the "Project Materials") as required by Article 17.2.2 of the Contract.

F.     **Exeter Attempted to Sabotage the Project After it was Terminated.**

74. In flagrant disregard of its contractual obligation, Exeter left the worksite for the Project without providing FCC with the Project Materials.

75. In an attempt to shut down the project, Exeter removed drawings and permits from the construction trailer at the Project.

76. In addition to failing to provide FCC with the Project Materials, Exeter actively

10

sought to destroy all known copies of permits and drawings essential to the completion of the Project.

77.     On July 29, 2015, Ballard, on behalf of Exeter, traveled to the Bureau Veritas facility in Huntington, Pennsylvania and falsely represented to the clerk that he worked for FCC and wanted all of the drawings and permits related to the Project. This was done with the purpose and full intent of destroying these drawings and permits. Fortunately, the clerk at the Bureau Veritas facility became suspicious of Ballard's behavior, refused to provide the documents, and called the Pennsylvania State Police.

78.     Exeter has also attempted to shut down the Project by threating its subcontractors (that would have to finish the Project with FCC) to not to do business with FCC.

79.     Exeter took drawings and plans from the subcontractors that were to be surrendered to FCC so they could not complete work on the Project.

80.     By letter dated July 29, 2015, FCC communicated to Exeter that it was aware of Exeter's efforts to sabotage the Project, and again demanded the return of the Project Materials.

81.     The letter also set forth FCC's intent to hold Exeter fully responsible for all costs related to Exeter's breaches, including but not limited to the liquidated damages for delay pursuant to Article 13.1 of the Contract.

82.     Exeter has refused to compensate FCC for the damages caused by Exeter's breaches and negligent, fraudulent and tortious actions taken against FCC.

83.     Because of Exeter and Ballard's defective and untimely work, FCC is now forced to complete the Project before the winter because $1,000,000 of manufacturing equipment has already been ordered and paid for and is in route to the Project from China.

84.     Among other things, FCC has been forced to expend funds to rent lifts, purchase

paint sprayers and have its own employees paint the rusting streel trusses so the Project could move on.

85. FCC has been forced to station two employees (who would otherwise be working on production) at the Project site to assist with construction. Moreover, two executives, a purchasing officer and two shop foremen have devoted approximately 50% of their time to completing the Project instead of on FCC's manufacturing and production.

86. FCC has been forced to hire a new MEP contractor for the Project as Exeter never engaged a MEP contractor.

87. FCC has also been forced to expend sums to pay the Architect to recreate the work product removed by Exeter.

88. FCC representatives have been unable to reach a resolution of this dispute via negotiation with Exeter representatives and, therefore, FCC has no choice but to file this lawsuit.

## COUNT I

### FRAUDULENT INDUCEMENT

### (FCC v. Exeter and Ballard)

89. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

90. Defendants represented to FCC, among other things, that Defendants were experts in construction projects like the Project, they could manage all elements of the design, procurement and construction of the Project, they would complete the Project in a timely manner, and that FCC would be able to focus on its business instead of the details of the construction of the Project.

91. Defendants represented to FCC that Exeter had heavy construction equipment,

such as bulldozers, and employees that it would devote to the Project.

92. Defendants represented that Exeter had completed several design and build projects at Dover Air Force Base, including, a $3.5 million project which involved Exeter completely remodeling supply building #639 to include a roofing system, wall systems, exterior doors, overhead doors and interior fit-out of two new offices.

93. Defendants provided FCC with a document representing that Exeter had served as the full service general contractor for several projects described in that document.

94. Defendants' representations were material to the transaction at hand and were intentionally false and misleading.

95. Defendants made these representations with knowledge of their falsity and/or with utter disregard and recklessness as to whether they were true or false.

96. Defendants made these representations with the intent of misleading FCC into relying upon them.

97. Defendants made these representations with the intent to induce FCC to enter into a contract with Defendants.

98. FCC justifiably relied upon Defendants' representations and would not have entered into the Contract absent such representations.

99. Defendants' actions were wanton, reckless, malicious and/or of oppressive character.

100. Defendants intentionally, willfully, recklessly and maliciously made false statements to FCC.

101. Defendants' misrepresentations and FCC's justifiable reliance proximately caused FCC to suffer significant harm and damage, including property damage, economic losses and attorneys' fees.

WHEREFORE, FCC demands judgment against Defendants jointly and severally for damages in excess of $75,000, plus interest, punitive damages, attorneys' fees any other relief the Court deems just and necessary.

## COUNT II

## BREACH OF CONTRACT

### (FCC v. Exeter)

102. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

103. FCC and Exeter entered into a Contract for Exeter to design and build a manufacturing facility, warehouse space and office space in return for remuneration in the amounts set forth in the Contract.

104. To date, FCC has performed all of its obligations under the Contract.

105. Exeter, through its representatives, employees, and agents, materially breached its obligations under the Contract by, *inter alia*, failing to progress the Project in a timely manner, by failing to prosecute the work, by failing to pay its debts to subcontractors and vendors.

106. As a result of Exeter's material breaches, FCC was forced to terminate Exeter for default.

107. As a direct and proximate cause of Exeter's breaches of Contract, FCC has suffered significant damages and is entitled to all such damages under the Contract, including compensation for amounts paid on Exeter's behalf to subcontractors and vendors, the cost of

replacement contractors for completion of the Project, costs of fixing defective work, liquidated damages, and all special and consequential damages.

108. Pursuant to Article 29.1 of the Contract, FCC is also entitled to its attorney's fees, costs and expenses incurred in connection with this legal action.

**WHEREFORE**, Plaintiff FCC respectfully requests that this Court enter judgment in its favor and against Exeter in a fair and reasonable amount to be determined at trial, plus interest, costs, and attorneys' fees, together with any further and additional relief that this Court may deem just and proper.

### COUNT III

### BREACH OF WARRANTY

### (FCC v. Exeter)

109. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

110. In Article 15.1.1 of the Contract Exeter warrants that its construction and design work on the Contract will be "free from defects" and "shall conform to all industry standards[.]" In Article 15.1.2 of the Contract Exeter warrants that all Work shall be furnished or installed "in a professional manner in accordance with manufacturers' requirements and Industry Standards[.]" In Article 15.1.3 Exeter warrants that the work shall be free of any defects, "including Defects in design, materials. [sic] workmanship, or fabrication."

111. Exeter's Work on the Project was defective in several respects including, *inter alia*, defective work performed on drainage areas in connection with the Project, causing damage and further delaying construction.

112. FCC relied upon Exeter's express warranties to its detriment.

113. As a result of Exeter's breach of express warranties within the Contract, FCC has sustained significant harm and damage.

114. Pursuant to Article 29.1 of the Contract, FCC is also entitled to its attorney's fees, costs and expenses incurred in connection with this legal action.

**WHEREFORE**, Plaintiff FCC respectfully requests that this Court enter judgment in its favor and against Exeter in a fair and reasonable amount to be determined at trial, plus interest, costs, and attorneys' fees, together with any further and additional relief that this Court may deem just and proper.

## COUNT IV

## SPECIFIC PERFORMANCE

### (FCC v. Exeter)

115. FCC restates and incorporates by reference all of the foregoing paragraphs of this Complaint as if fully set forth herein.

116. FCC and Exeter entered into a valid Contract, pursuant to which FCC agreed to pay valid consideration of in exchange for complete and timely work performed by Exeter.

117. The terms of the Contract are clear, unambiguous, and certain.

118. Although FCC materially performed under the Contract, Exeter did not.

119. As a result, FCC rightfully terminated Exeter for Default on July 28, 2015.

120. Article 17.2.2 of the Contract obligates Exeter to return to FCC "all information, Required Manuals, Contractor Deliverables, documents, patents, and licenses of Contractor related to the Work (whether completed or not) reasonably necessary to permit Owner to complete or cause the completion of the Work" in the event of Exeter's Default.

121. FCC's termination letter to Exeter dated July 28, 2015 formally demanded the

return of all materials described in Article 17.2.2 of the Contract.

122. Exeter, therefore, had a contractual obligation to return any permits and drawings in its possession after FCC terminated Exeter for Default.

123. Despite the terms of the Contract and FCC's explicit demand for the return of all Project Materials, Exeter has not yet returned all permits, drawings and other documents that rightfully belong to FCC.

124. Exeter's refusal constitutes a breach of the Contract.

125. As a direct and proximate cause of Exeter's breach, FCC has suffered harm because the permits and drawings are necessary to FCC's ability to lawfully and efficiently continue with the Project.

126. FCC cannot be made whole through monetary damages, as the permits are unique, identifiable, and unable to be replicated without significant time and expense. The drawings are also unique and identifiable, and their loss will cause significant delay to the Project.

127. As a result, FCC has no adequate remedy at law.

**WHEREFORE,** FCC requests the Court to enter judgment in its favor:

(a)  granting FCC damages, in an amount to be determined;

(b)  compelling Exeter to specifically perform under the Contract by providing FCC with the missing permits and drawings;

(c)  awarding FCC its attorney's fees, costs and expenses incurred in connection with this legal action pursuant to Article 29.1 of the Contract; and

(d)  granting FCC any other relief or remedy this Court deems just and necessary.

Dated:  September 28, 2015             __/s/ William D. Wickard_____
Jason L. Richey, Esquire
Pa. I.D. # 78943
William Wickard, Esquire
Pa. I.D. # 87741

K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Tel.:  (412) 355-6260

*Counsel for Plaintiff*
*Federal Carbide Company*