IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL CARBIDE COMPANY

Plaintiff,

v.

EXETER CONSTRUCTION, LLC., and

DENNIS B. BALLARD

Defendants

Civil Action No. 3. 3:15-cv-248

Judge Kim R. Gibson

## DEFENDANTS' MOTION TO SET ASIDE DEFAULT

AND NOW, comes Defendants, Exeter Construction, LLC ("Exeter") and Dennis B. Ballard ("Ballard") by its counsel Babst, Calland, Clements and Zomnir, P.C., and files the following Motion to Set Aside Default, and in support thereof avers as follows:

1.      Exeter and Federal Carbide Company ("FCC") entered into a design-build contract in August of 2014 whereby Exeter would design, engineer, and construct a new manufacturing facility, warehouse, and office for FCC in Tyrone, Blair County, Pennsylvania (the "Project"). The original contract amount was $1,759,784.00.(Doc. 1, Exhibit A).

2.      FCC terminated Exeter on July 28, 2015, claiming Exeter did not achieve substantial completion by a date certain, did not pay its debts as they came due, and failed to prosecute the work. (Exhibit A, FCC Termination Letter).

3.      The basis of the termination letter was exaggerated and incorrect. The design-build contract was fundamentally altered by FCC's requests to construct an additional building, which Exeter agreed to perform through change orders. These change orders totaled $1,191,346.90. (Exhibit B, Change Orders). Exeter had no issues paying its subcontractors and only stopped its work briefly in early 2015 due to severe winter weather which made construction activities impossible.

{B2344427.1}

4.      At the time of the termination letter, Exeter was owed substantial money in accordance with the terms of the change orders and contract. Prior to its termination, Exeter had over $150,000.00 of materials delivered to the Project site for which it was never paid. It is believed an internal dispute amongst the owners of FCC regarding the approved change order work led to Exeter's termination.

5.      It is believed FCC knew the termination placed Exeter in a financially vulnerable position, which FCC sought to take advantage of.

6.      Section 29.1 of the Contract states, *inter alia:*

> "Any disputes arising pursuant to this Agreement that cannot be resolved between Owner's Project Representative and Contractor's Project Manager within fifteen (15) Business Days after receipt by each thereof of Notice of such dispute shall be referred to the executive level officers of the Parties designated in Section 30.4 as their designated representatives for resolution." ***If the Parties, negotiating in good faith, fail to reach an agreement within the period of time set forth above in 29.1, then Owner and Contractor agree that any and all disputes…. Shall be submitted to the jurisdiction of the federal or state courts located in the Commonwealth of Pennsylvania…" (emphasis added).***

(Doc. 1, Exhibit A, Section 29.1)

7.      Exeter attempted to contact FCC's Project Representative numerous times after receipt of the termination letter in accordance with Section 29.1 of the Contract. Exeter was repeatedly ignored.

8.      Negotiations between designated representatives of Exeter and FCC for purposes of resolving the issue did not occur in accordance with Section 29.1 of the Contract, through no fault of Exeter.

9.      On September 11, 2015, Exeter responded to FCC's termination letter through counsel, requesting payment for services and materials supplied to the Project Site. Exeter

notified FCC it was open to good faith negotiations in accordance with Section 29.1 of the Contract. (Exhibit C, Exeter Letter).

10.     Counsel for FCC contacted counsel for Exeter on Friday, September 25, 2015, acknowledging receipt of Exeter's letter and avowing FCC's willingness to meet with Exeter to resolve the dispute. Exeter reasonably believed that FCC intended to comply with the contractual provisions of Section 29.1 to negotiate in good faith prior to filing suit.

11.     FCC filed suit against Exeter and Ballard, individually, on Monday, September 28, 2015, thus breaching the contractual provision to negotiate in good faith prior to filing suit. (Doc. 1).

12.     Even after filing suit, FCC expressed its desire to negotiate a resolution with Exeter, proposing a meeting date of October 6, 2015. Defendant Dennis Ballard traveled from Delaware to Pittsburgh to participate in the meeting.

13.     FCC's expressed desire to negotiate in good faith was a sham. FCC used the meeting to personally serve Ballard, an out-of-state defendant, who accepted service on behalf of himself and Exeter. At the short meeting, FCC strenuously enforced its position it would never pay Exeter for the work it performed or materials it supplied.

14.     FCC's conduct was unwarranted and a breach of the contractual provision to negotiate in good faith prior to filing suit.

15.      It is believed FCC's behavior was guided by its knowledge of the financially precarious position it had placed Exeter. When FCC terminated Exeter, it knew Exeter had incurred significant costs for materials it had not been compensated for and was owed substantial amounts of money.

16.      It is believed FCC's lawsuit, especially those claims against Ballard individually, is an intimidation tactic meant to force Exeter to walk away from money owed through threats of

protracted, expensive litigation. FCC has even attempted to personally embarrass Ballard. FCC's Complaint, for example, insinuates Ballard engaged in extramarital affairs when FCC's suit is for breach of contract and such information is immaterial to the cause of action. (Doc. 1, ¶¶ 64, 65).

17.    Exeter and Ballard were suffering from financial hardships created by FCC's termination. Exeter and Ballard were initially unable to retain counsel to defend this action and lawfully assert its valid counterclaims against FCC.

18.    On November 13, 2015, Default was entered against Exeter and Ballard for failure to plead or otherwise defend pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. (Doc. 9).

19.    On November 19, 2015, Exeter and Ballard became financially able to retain counsel to defend this action and assert claims of its own.

20.    Under Rule 55(c), the Court may set aside the entry of default for "good cause." Fed. R. Civ. P. 55(c).  Entry of default is not favored and doubtful cases should be resolved in favor of the party moving to set aside the default judgment so that cases may be decided on their merits.  *U.S. v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194-95 (3d Cir. 1984).

21.    Relief from the entry of default is granted more readily than relief from a default judgment.  *Mike Rosen & Assoc., P.C. v. Omega Builders, Ltd.*, 940 F. Supp. 115, 120 (E.D. Pa. 1996).

22.    The Third Circuit has established three factors which must be considered in determining whether to set aside an entry of default: (1) whether the defendant has a meritorious defense; (2) whether the plaintiff will be prejudiced; and (3) whether the defendant's culpable conduct led to the default. *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 656 (3d Cir. 1982).

23.     With respect to the first factor, a meritorious defense is a defense that is not invalid on its face. *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987).

24.     In this case, Ballard is not a proper party to this action and Exeter is owed money for labor and materials on the Project. A meritorious defense is evident because FCC's basis for terminating Exeter was erroneous as more fully set forth in the Brief in Support. FCC's lawsuit against Exeter and Ballard was filed solely as an attempt to intimidate Exeter from recovering payments that it is owed for work performed.

25.     With respect to the second factor, to establish prejudice Plaintiff has the burden of demonstrating that his claim "would be materially impaired because of the loss of evidence, an increased potential for fraud or collusion, substantial reliance on the entry of default, or other substantial factors." *U.S. ex rel. Construction Hardware, Inc. v. Patterson*, 2013 WL 5356851, at *2 (E.D. Pa. Sept. 24, 2013) (quoting *Dizzley v. Friends Rehab. Program, Inc.*, 202 F.R.D. 146, 148 (E.D. Pa. 2001)).  Delays in Plaintiff's potential recovery or potential expenses incurred from litigating the matter on the merits do not constitute the kind of prejudice the Court should consider in deciding whether to set aside an entry of default. *Id.* (citing *GE Med. Sys. Info. Techs., Inc. v. Ansar, Inc.*, 2004 WL 2988513, at *2 (E.D. Pa. Dec. 23, 2004)).

26.     In this case, Exeter and Ballard filed its Motion to Set Aside the Default twelve days after entry of the Default and four days after it retained counsel for the matter. Accordingly, there is no prejudice to Plaintiffs if the default is set aside.

27.     With respect to the third factor, for a defendant's conduct to be culpable, the "conduct leading to the entry of the default must have been willful, intentional, reckless or in bad faith." *Ksure of N.Y. Corp. v. Raineater, LLC*, 2013 WL 4400168, at *2 (W.D. Pa. Aug. 15, 2013) (citing *Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 657 (3d Cir. 1982)).

28.     In this case, Exeter and Ballard's conduct was not culpable. Exeter attempted to engage FCC in meaningful resolution negotiations prior to instituting legal action in accordance with Section 29.1 of the Contract. FCC initially refused to engage in such negotiations. FCC then agreed to engage in such negotiations, yet filed a lawsuit one business day later, thus breaching the good faith negotiation standard in Section 29.1. Moreover, FCC deceptively agreed to negotiate in good faith even after filing suit. The overture was a sham, as FCC used the meeting to effectuate personal service on the out-of-state defendants and then refused to negotiate in good faith.

29.     FCC knew of Exeter and Ballard's financially precarious situation, and used the guise of good faith negotiations to quickly file a lawsuit, serve the Defendants, and have default entered before Exeter and Ballard could financially retain counsel.  Defendants' conduct was not culpable.

30.     Accordingly, because all three factors favor setting aside the default and because even doubtful cases should be resolved in favor of the moving party, Exeter and Ballard respectfully requests that the Court set aside the default.

WHEREFORE, for all of the above reasons, Defendants Exeter and Ballard respectfully request that this Court set aside the default entered by the Clerk and allow Defendants twenty days to respond to Plaintiff's Complaint.

Respectfully Submitted,

/s/ Robert M. Palumbi, Esq.

Dated:   November 25, 2015

D. Matthew Jameson III, Esq.
PA ID No. 67764
Robert M. Palumbi Esquire
PA ID No. 307774

Babst, Calland, Clements and Zomnir, P.C.
Firm PA ID No. 812
Two Gateway Center, 7th Floor

{B2344427.1}

6

603 Stanwix Street
Pittsburgh, PA  15222
412.394.5400

Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2015 I electronically submitted the foregoing document to the Clerk of the Court for the United States District Court for the Western District of Pennsylvania, using the electronic case files system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to the following individuals who, by rule, have consented to accept the Notice as service of this document by electronic means:

> Jason L. Richey, Esquire
> William Wickard, Esquire
> K&L Gates LLP
> K&L Gates Center
> 210 Sixth Avenue
> Pittsburgh, Pennsylvania 15222

> *Counsel for Plaintiff Federal Carbide Company*

*/s/ Robert M. Palumbi, Esq.*