IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FEDERAL CARBIDE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:15-cv-248 |
| EXETER CONSTRUCTION, LLC., and | ) |
| DENNIS B. BALLARD, | ) |
| | ) |
| Defendants. | ) |

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO SET ASIDE DEFAULT**

"Defendants' Motion to Set Aside Default" [ECF No. 10] (the "Motion") is Defendant Dennis Ballard's latest attempt at foot dragging and delay and does not even come close to satisfying the good cause standard required by Federal Rule of Civil Procedure 55(c) for setting aside a default.

Federal Carbide Company ("FCC") recently learned that Ballard has already been named a party in approximately 51 Delaware lawsuits about construction projects and land deals and has approximately 33 judgments (totaling well over $1,000,000) entered against him in Delaware, the vast majority of them by default. His reputation thoroughly sullied in Delaware, in 2014, Ballard turned his sights upon finding new victims in Pennsylvania, set up a new shell company called Exeter Construction, LLC ("Exeter"), and fraudulently induced FCC to award a construction contract to Exeter. Ballard and Exeter showed up unprepared for the project, failed to comply with the contract, abandoned the project, failed to pay subcontractors and performed defective work. FCC was left with no choice but to terminate the contract and file this suit.

Consistent with his past practices, Ballard ducked FCC's initial attempts to serve him with the complaint. Once FCC was finally able to complete service, Ballard ignored his legal

obligations, failed to make an appearance or file a response or participate in the case. Instead, he sat back and did nothing for months, forcing FCC to incur the expense of filing for default and preparing a default judgment motion.

Now, at the last possible minute, Defendants have filed the Motion requesting this Court simply excuse their blatant disregard of its rules. Without any affidavit, verification or evidence whatsoever, Defendants claim that FCC had some sort of scheme to terminate and sue Exeter quickly, trick Ballard to come to Pennsylvania and then file for default. This claim, as well as the Motion, is frivolous. In particular, as shown below, the Motion should be denied because: (1) Defendants do not have a meritorious defense to any of FCC's claims; (2) FCC will be prejudiced if this Court re-opens the default; and (3) Defendants' default was the result of Defendants' culpable conduct. This Court should deny the Motion so that FCC can file a motion for default judgment.

## BACKGROUND

**A.   Defendants Induce FCC to Enter a Contract for the Project.**

Ballard is a resident of Delaware and president of Exeter, which Ballard formed on April 3, 2014. See Complaint [ECF No. 1] at ¶ 1[1]; Exhibit 1, Exeter Division of Corporation filing. Prior to forming Exeter, Ballard and several of Ballard's entities were involved in an extensive amount of Delaware state lawsuits regarding construction projects and land deals. A search of

---

[1]   Because Defendants have failed to answer and defaulted, the facts contained in the Complaint must be taken as true. See, e.g., Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990) (as a result of a default, "factual allegations of the complaint, except for those relating to the amount of damages, will be taken as true."); United States ex rel. Motley v. Rundle, 340 F. Supp. 807, 809 (E.D. Pa. 1972) ("By virtue of the default, the truth of these well-pleaded allegations is admitted. They may not be contested on the merits, and have the same effect as if established by proof."). This is particularly true here where Defendants have not filed any affidavit or proposed answer disputing any facts contained in the Complaint.

Delaware dockets shows Ballard was a party to approximately 51 suits and had approximately 33 judgments (totaling well over $1,000,000) entered against him, the vast majority of them by default.  See Exhibit 2, Results of Delaware docket search.  The vast majority of these judgments remain outstanding (i.e., only three relatively small judgments have been marked as satisfied).  See Exhibit 3, Results of Delaware judgment search.

FCC is a world leader in the manufacture of Cemented Tungsten Carbides and Tungsten Heavy Alloy components and maintains a fully integrated manufacturing complex in Tyrone, Pennsylvania.  See Complaint at ¶¶ 13-14.  Because FCC was experiencing rapid growth, in 2014, FCC decided to build a new manufacturing facility, warehouse space and office space for FCC in Tyrone, Pennsylvania (the "Project").  See id. at ¶ 15.  In or around August 2014, FCC approached Ballard regarding the ability of Exeter to serve as FCC's general contractor and manage all elements of the design, procurement and construction of the Project.  See id. at ¶¶ 16-17.

Ballard made numerous representations to FCC regarding Exeter's expertise, qualifications and experience in the design and construction of manufacturing facilities like the Project.  See id. at ¶ 19.  Specifically:

- Ballard represented to FCC that Exeter had heavy construction equipment, such as bulldozers, that it would devote to the Project.

- Ballard represented to FCC that Exeter had employees that it would devote to the Project.

- Ballard provided FCC with a document representing that Exeter had served as the full service general contractor for several projects described in that document.

- Ballard represented that Exeter had completed several design and build projects at Dover Air Force Base on time and on budget.

- Ballard represented that Exeter had completed a $3.5 million project at Dover Air Force Base which involved Exeter completely remodeling supply building #639 to include a roofing system, wall systems, exterior doors, overhead doors and interior fit-out of two

new offices. See id. at ¶¶ 19-24.

As a result of these representations, FCC entered into a "Design-Build Agreement for Engineering, Procurement and Construction Services" with Exeter on or around September 11, 2014 (the "Contract"). See id. at ¶ 36. However, all these representations were false. See id. at ¶¶ 25-37. Ballard and Exeter were not qualified for the Project; neither had ever designed and constructed a facility such as the Project. See Complaint at ¶¶ 27-35. Exeter is essentially only Ballard and has no other employees. See id. at ¶ 31. Indeed, because Ballard did not even create Exeter until April 3, 2014 (Exhibit 1, Exeter Division of Corporation filing), Exeter could not have performed any of the projects Ballard said it did in the 3-4 months prior to contract signing.

**B.      Exeter Breaches the Contract, Renders Defective Work and Delays the Project.**

In the Contract, Exeter agreed to manage all elements of the design, procurement and construction of the Project and complete the Project within 200 days. See Complaint at ¶¶ 36-38; 42; Exhibit A, Contract at Article 1.68. After beginning the Project, Exeter showed up unprepared, failed to comply with contractual requirements, abandoned the Project at times, failed to pay subcontractors and performed defective work. See Complaint at ¶¶ 46-60. The Project fell far behind schedule. See id. at ¶¶ 60-70. By the Contract's Completion Date of March 30, 2015, the Project was far from being completed; site preparation had not been completed and the concrete foundation had not been poured. See id. at ¶ 60. In July 2015 (approximately two months after the Completion Date), even though the Project was way behind schedule and was not even close to achieving Substantial Completion, Exeter abandoned the Project and shut down work on the Project so Ballard could go to Las Vegas. See id. at ¶ 69. FCC was left with no choice but to terminate the Contract on July 28, 2015 via a letter which set

forth examples of Exeter's defaults and provided notice of FCC's intent to bring claims against Exeter. See id. at ¶ 71.

Immediately after being terminated, Exeter and Ballard began attempting to sabotage and shut down the Project, by among other things, threatening subcontractors to convince them not to work with FCC and destroying needed permits, drawings and specifications related to the Project rather than returning such documents to FCC as they were obligated. See id. at ¶¶ 74-82. As such, on July 29, 2015, FCC sent another letter to Exeter, demanding the return of all documents, drawings and permits to FCC immediately and providing notice of FCC's intent to hold Exeter responsible for all costs related to Exeter's breaches. See id. at ¶¶ 80-81.

**C.     Defendants Hire Counsel and then Refuse to Participate in the Litigation.**

On September 11, 2015, Defendant's Counsel, Attorney Palumbi, sent FCC a letter stating that he and his firm, Babst, Calland, Clements and Zomnir, P.C. ("Babst Calland"), represented Exeter: "Please be advised that this law firm represents Exeter Construction, LLC." Motion at Exhibit C. The letter demanded FCC pay Exeter a certain amount of money within fifteen days and threatened to file a mechanics' lien if FCC did not pay. See id.

Because FCC owed Exeter nothing, and Exeter owed FCC significant sums for the damage it had caused, on September 28, 2015, FCC filed the Complaint. The Complaint contained counts for fraudulent inducement, breach of contract, breach of warranty and specific performance and sought compensatory damages, attorneys' fees pursuant to an agreed-upon attorneys' fee provision, and punitive damages. See Complaint at ¶¶ 89-127. FCC included Attorney Palumbi and Babst Calland as Defendants' counsel on the Complaint's civil cover sheet. See Civil Cover Sheet [ECF No. 1-1]. FCC attempted to serve Defendants with the Complaint and summons via certified mail. Ballard avoided these attempts, refusing to accept

the mail.

On September 29, 2015, Attorney Palumbi emailed FCC's counsel, stating he was aware of the lawsuit and requested a settlement meeting. See Exhibit 4, 9/29/15 email from R. Palumbi to J. Richey. FCC made clear that FCC was still willing to meet with Defendants to attempt to resolve the dispute but FCC expected to be paid for the significant damages caused by Defendants. See Exhibit 4, 9/29/15 email from J. Richey to J. Palumbi. FCC's counsel also provided Defendants' counsel information regarding the outstanding judgments against Ballard and made clear FCC had to move forward with its claims:

> As you can see from the two attachments, your client has been sued many, many times and he has many, many significant outstanding judgments (totaling well over a $1 million) against him. This is very troubling. We need to move forward with our claims as there are potentially a number of other creditors in line. We are attaching a copy of our Complaint for your convenience.

Id.

On October 6, 2015, the parties held a settlement conference in Pittsburgh. Ballard attended the meeting represented by Attorney Palumbi. Also on that date, FCC was finally able to personally serve Ballard and Exeter with the Complaint. [ECF Nos. 6 & 7]. As such, Defendants were required to file a responsive pleading to the Complaint within 21 days pursuant to Rule 12(a)(1)(A)(i) of the Federal Rules of Civil Procedure, i.e., October 27, 2015.

Neither Defendant ever filed an answer, entered an appearance or ever participated in the litigation. At no time did Ballard or his counsel ever request an extension of time to respond to the Complaint from FCC. As such, on November 12, 2015, FCC requested the Clerk to enter default against both Defendants. [ECF No. 8]. On November 13, 2015, the Clerk entered default against both Defendants for failing to appear, plead or otherwise defend. [ECF No. 9]. On November 25, 2015, Defendants filed the Motion [ECF No. 10] and a Brief in Support of

Motion [ECF No. 12] (the "Brief").  That same day, Attorney Palumbi and Babst Calland entered an appearance as Defendants' counsel.  [ECF No. 11].

## ARGUMENT

A court may only set aside an entry of default if the defendant shows good cause.  Fed. R. Civ. P. 55(c).  Generally, for a court to find good cause to set aside the entry of default, the defendant must show:  (1) the defendant has a meritorious defense; (2) the plaintiff will not be prejudiced by the reopening; and (3) the default was not the result of the defendant's culpable conduct.  See U.S. v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir. 1984).  As shown below, Defendants do not satisfy any of these elements.

**A.      Defendants Do Not Have a Meritorious Defense to Any of FCC's Claims.**

The threshold inquiry in deciding whether to open a default is whether defendant has asserted a meritorious defense.  See Hirtz v. Woma Corp., 732 F.2d 1178, 1181 (3d Cir. 1984); see also World Entm't Inc. v. Brown, 487 Fed. Appx. 758, 761 (3d Cir. 2012) ("Failure to establish a meritorious defense weighs heavily against setting aside the default."); $55,518.05 in U.S. Currency, 728 F.2d at 195 (declining to consider other factors when defendant failed to establish meritorious defense).  The burden is on the defendant to present "*specific facts*" that would allow them to advance a "*complete defense* to the action."  Id. (emphasis added).  Denials, "conclusory statement[s]" or "perfunctory statement[s]" are insufficient without "credible factual allegations." American States Ins. Co. v. Bennett, 102 F.R.D. 102, 103 (W.D. Pa. 1984).

As shown below, Defendants have not met their burden of establishing a meritorious defense to any of the four counts contained in FCC's Complaint - fraudulent inducement, breach of contract, breach of warranty and specific performance.

### 1. Fraudulent Inducement.

First, Defendants argue they have a meritorious defense to FCC's fraudulent inducement claim. See Brief at 6. This argument has no merit.

FCC has provided specific factual allegations of Ballard's numerous false representations to FCC regarding Defendants' expertise, qualifications and experience in the design and construction of manufacturing facilities like the Project. See Complaint at ¶¶ 19-37. For instance:

- Ballard represented to FCC that Exeter had heavy construction equipment, such as bulldozers, that it would devote to the Project.

- Ballard represented to FCC that Exeter had employees that it would devote to the Project.

- Ballard provided FCC with a document representing that Exeter had served as the full service general contractor for several projects described in that document.

- Ballard represented that Exeter had completed several design and build projects at Dover Air Force Base on time and on budget.

- Ballard represented that Exeter had completed a $3.5 million project at Dover Air Force Base which involved Exeter completely remodeling supply building #639 to include a roofing system, wall systems, exterior doors, overhead doors and interior fit-out of two new offices.

See id. at ¶¶ 19-24. Defendants do not specifically dispute these. Instead, with no proposed answer, affidavit, or evidence, Defendants simply state they did "not make false representations to FCC regarding its previous work or ability to perform the Project." Brief at 6. Because these conclusory denials are not the specific and "credible factual allegations" required by law, Defendants' Motion should be denied. Bennett, 102 F.R.D. at 103; see also, e.g., Rios v. Marv Loves 1, No. 13-CV-1619, 2015 WL 5161314, at *5 (E.D. Pa. Sept. 2, 2015) (denying motion to vacate default where defendants never submitted a "proposed answer" and the "defenses" in defendants' unverified brief "amount[ed] to nothing more than general denials, attacks on

Plaintiff's credibility, and conclusory arguments"); U.S. v. Mentzer, No. 09-cv-2065, 2012 WL 1020232, at *3, 5 (E.D. Pa. Mar. 27, 2012) (denying motion to vacate default where defendant's submissions merely denied plaintiff's allegations and "fail[ed] to make any factual assertions"); Grzegorek v. All Credit Finance, Inc., No. 2:08-cv-771, 2009 WL 3241861, at *2 (W.D. Pa. Oct. 2, 2009) (denying motion to vacate default where defendants "failed to point to any evidence that might sustain a meritorious defense").

Even if Defendants' conclusory statement was sufficient (which it is not), it is not a "***complete defense*** to the action." $55,518.05 in U.S. Currency, 728 F.2d at 195. FCC's specific factual allegations are not limited to Defendants' "previous work" but allege Ballard made numerous false representations to FCC regarding Exeter's equipment, employees, capability, prior projects, experience and expertise in order to induce FCC to contract with Exeter for the Project. See Complaint at ¶¶ 19-24. Any one of these false representations is sufficient to support FCC's fraudulent inducement claim. Defendants fail to even attempt to address the majority of these false representations - or any of the other elements of FCC's fraudulent inducement claim.[2] This is yet another reason why Defendants' Motion should be denied. See, e.g., Bennett, 102 F.R.D. at 103 (denying motion where "[d]efendants' allegations, even if fully established, do not constitute a complete defense to Plaintiff's action").

**2. Breach of Contract.**

Next, Defendants claim they have a meritorious defense to FCC's breach of contract claim based upon the cardinal change doctrine. Brief at 7. This too has no merit.

---

[2] The elements of a fraudulent inducement/intentional misrepresentation claim are: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994).

Once again, Defendants fail to meet their burden of presenting any specific and "credible factual allegations" regarding the cardinal change defense. Bennett, 102 F.R.D. at 103. With absolutely no evidence or affidavit, Defendants simply offer "general denials, attacks on Plaintiff's credibility, and conclusory arguments." Rios, 2015 WL 5161314, at *5. This is not a meritorious defense.

Even if Defendants' conclusory statements were sufficient (which they are not), the cardinal change doctrine only applies in the government contracts context and "occurs when the *government* effects an alteration so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then a cardinal change is so profound that it is not redressable under the contract, and thus renders the *government* in breach." Roy F. Weston Servs., Inc. v. Halliburton Nus Envtl. Corp., No. Civ. A. 91-1133, 1993 WL 57812, at *3 (E.D. Pa. Mar. 3, 1993) (emphasis added). This case involves a private project and does not involve a government contract. As such the cardinal change doctrine is inapplicable.

Even if the doctrine was applicable (which it is not), Defendants have waived it. In the Contract, Exeter agreed that FCC could request *any* changes to the work and Exeter would never claim the Contract had been abandoned:

> Owner shall have the right to request changes in the Work, whether such changes are modifications, accelerations, alterations, additions or deletions. Such changes shall not impair, affect or void this Agreement or give rise to claim that there has been an abandonment of this Agreement. All changes shall be made in accordance with this Article 14 and shall be considered, for all purposes of this Agreement, as part of the Work. If there is a dispute concerning such Change In Work, Contractor shall proceed as directed by Owner but may do so under protest and with a reservation of rights.

Complaint at Exhibit A, Contract at Article 14.2. As even Fuller Co. v. Brown Minneapolis Tank & Fabricating Co. cited by Defendants provides, a party waives its ability to raise the

cardinal change doctrine when it continues to perform under the contract. 678 F. Supp. 506, 509 (E.D. Pa. 1987) ("[A] party cannot continue to perform under the contract and later be heard to say that the other party breached the agreement prior to the continued performance, and therefore, no contract existed."). Defendants admit that they continued to perform under the Contract despite FCC's alleged cardinal change without providing any protest or reservation of rights as required by Article 14.2 of the Contract. As such, Defendants have waived any argument that FCC ordered a cardinal change.

### 3. Breach of Warranty.

Defendants claim they have a meritorious defense to FCC's breach of warranty claim because FCC "never raised an issue with Exeter's work and timely paid all pay applications." Brief at 7. Once again, this conclusory statement (unsupported by any evidence or affidavit) fails to satisfy Defendants' burden of presenting any specific and "credible factual allegations". Bennett, 102 F.R.D. at 103.

In any event, even if this statement is proven at trial, it does not present any defense (let alone a complete defense) to FCC's breach of warranty claim. The elements of a breach of express warranty claim are: "[1] the defendant breached or failed to meet its warranty promise, [2] that the breach was the proximate cause of the plaintiff's harm and [3] the amount of ensuing damages." Roberts v. NVR, Inc., No. 15-489, 2015 WL 3745178, at *3 (W.D. Pa. June 15, 2015) (citing Samuel-Bassett v. Kia Motors Am., Inc., 34 A.3d 1, 35 (Pa. 2011)). FCC has shown that Exeter issued warranties on its work, its work was defective and untimely, it breached its warranties, that Exeter failed to cure its breaches, that it failed to correct the defects, and that the breaches caused damages. See Complaint at ¶¶ 38-87. Whether FCC timely paid Exeter's pay applications is irrelevant to whether Exeter breached its warranties. Indeed, the

Contract makes clear that "No payment made hereunder shall be construed to be [FCC's] acceptance or approval of that part of the Work to which such payment relates or to relieve [Exeter] of any of its obligations hereunder." Id. at Exhibit A, Contract at Article 7.7.

As such, Defendants have failed to demonstrate a meritorious defense to the Complaint's cause of action for breach of express warranty.

### 4. Specific Performance.

Finally, Defendants claim they have a meritorious defense to FCC's specific performance claim because "FCC has all information related to the Project." Brief at 7. Yet again, this conclusory statement (unsupported by any evidence or affidavit) fails to satisfy Defendants burden of presenting any specific and "credible factual allegations" regarding this defense. Bennett, 102 F.R.D. at 103.

Moreover, this statement does not present any defense to FCC's specific performance claim. "[I]n a contract action seeking specific performance, a plaintiff must prove the existence of a contract, the actual terms of the agreement, and its willingness and readiness to perform." The Partnership CDC v. Apple Storage Co., Inc., No. 246 Aug. Term 2004, 050065, 2005 WL 1953041, at *4 (Pa. Com. Pl. July 29, 2005). Here, Exeter has failed to comply with Article 17.2.2 of the Contract which obligates Exeter to return to FCC "all information, Required Manuals, Contractor Deliverables, documents, patents, and licenses of Contractor related to the Work (whether completed or not) reasonably necessary to permit Owner to complete or cause the completion of the Work" in the event of Exeter's Default, despite FCC demanding such information. See Complaint at ¶¶ 115-127. Defendants do not dispute any of this.

As such, Defendants have no meritorious defense to FCC's specific performance claim.

B. **Setting Aside the Default Will Prejudice FCC.**

Next, a court must consider whether plaintiff will be prejudiced by reopening the default. See $55,518.05 in U.S. Currency, 728 F.2d at 195. Setting aside an entry of default will cause a plaintiff prejudice if it results in loss of available evidence or increased potential for fraud or collusion. See Rios, 2015 WL 5161314, at *5. "Thus, courts consider whether relevant evidence has been lost or if the plaintiff's ability to pursue her claim has otherwise been affected by the passage of time." Id. (citation omitted). "The length of delay does not determine the prejudice issue." Id.

As an initial matter, FCC has already been hampered in its ability to complete the Project by Exeter's failure to comply with Article 17.2.2 of the Contract and to return to FCC "all information, Required Manuals, Contractor Deliverables, documents, patents, and licenses of Contractor related to the Work (whether completed or not) reasonably necessary to permit Owner to complete or cause the completion of the Work." Complaint at Exhibit A, Contract at Article 17.2.2; id. at ¶¶ 73-82, 115-127. This is especially critical because FCC must complete the Project soon because $1,000,000 of manufacturing equipment has already been ordered and paid for and is in route from China. See id. at ¶ 83. Nonetheless, if the default is opened and FCC is prevented from obtaining a default judgment ordering Exeter to specifically perform under the Contract and provide the missing permits and drawings, FCC will incur the significant delay of completing the Project without the original drawings and permits. See id. at ¶ 126. As such, re-opening the default will prejudice FCC by preventing FCC from both completing the Project and pursuing its claims.

Further, Ballard already has approximately 33 different outstanding judgments entered against him in Delaware alone totaling well over $1,000,000. See Exhibit 3, Results of Delaware

judgment search. Re-opening the default in this case will only increase the potential for fraud and collusion and permit Defendants to hamper FCC's ability to obtain evidence to support their claims as Ballard has done in the past. For instance:

- In June 2010, a church filed a complaint against Ballard for breach, theft of trust funds, fraud and replevin, alleging Ballard provided defective construction work, misappropriated over $300,000 in funds, issued unauthorized change orders, and stole the church's materials (including serpentine stone). See Exhibit 5, First Presbyterian Church of Smyrna, Del. v. Ballard Builders, *et. al*, Del. Super. Ct., Case No. K10C-06-016, Complaint filed 6/10/10. In that case, Ballard initially hired an attorney to enter an appearance and file some preliminary pleadings just as he has done here. However, Ballard's attorney withdrew shortly thereafter and was never replaced. The church moved for and obtained a default judgment and an award of $643,663 in damages, which Ballard has never satisfied, necessitating the church incur the additional expenses associated with executing on the judgment. See Exhibit 6, First Presbyterian Church of Smyrna, Del. v. Ballard Builders, *et. al*, Del. Super. Ct., Case No. K10C-06-016, Docket.

- In May 2010, a bank sued Ballard for defaulting on a note and obtained a default judgment against Ballard for approximately $40,000. See Exhibit 7, Wilmington Trust Co. v. Ballard Builders, *et. al*, Del. Super. Ct., Case No. N10C-05-0123, Complaint filed 5/10/10; Exhibit 8, Wilmington Trust Co. v. Ballard Builders, *et. al*, Del. Super. Ct., Case No. N10C-05-0123, Docket. After the judgment was entered, the bank attempted to take Ballard's deposition to aid in the execution of judgment and then had to file a motion to compel. Ballard failed to appear for a deposition three different times. See Exhibit 9, 4/13/15 letter to judge. In May 2015, the Court issued an order holding Ballard in contempt and issued capias and set bail at $2,500. See Exhibit 8, Wilmington Trust Co. v. Ballard Builders, *et. al*, Del. Super. Ct., Case No. N10C-05-0123, Docket.

In sum, setting aside the default will prevent FCC from pursuing its claims while permitting Ballard the opportunity to fraudulently conceal or transfer his assets and destroy evidence, all the while forcing FCC to complete the Project without the necessary permits and drawings. This prejudice is yet another reason why the Motion should be denied. See, e.g., Titus v. Smith, 51 F.R.D. 224, 227 (E.D. Pa. 1970) (finding prejudice where defendant defaulted because "[w]hile plaintiff was writing letters in an attempt to stir the defendant to action, discovery was stalled. As time passes, memories fade and documents are lost or destroyed. As

the accessibility to the truth through discovery decreases, the opportunity for fraud and collusion increases. Similarly this type of conduct cannot be condoned by the court.").

### C.     The Default Was the Result of Defendants' Culpable Conduct.

Finally, a court must consider whether the default was the result of the defendant's culpable conduct. See $55,518.05 in U.S. Currency, 728 F.2d at 195. "Culpable conduct" is "dilatory behavior that is willful or in bad faith." Mentzer, 2012 WL 1020232, at *3. "Reckless disregard for repeated communications from plaintiffs and the court … can satisfy the culpable conduct standard." Rios, 2015 WL 516134, at *6 (internal citations omitted). "[A] continued pattern of foot-dragging and delay" is culpable conduct. Grzegorek, 2009 WL 3241861, at *3.

Here, Defendants do not dispute that they have been properly served with the Complaint and summons. Nonetheless, Defendants completely failed to respond to the Complaint or participate in the litigation. Nor did Defendants or their counsel ever request an extension of time to respond to the complaint from FCC. Such failure to appear and/or respond to legal communications is culpable conduct. See, e.g., World Entm't, 487 Fed. Appx. at 761 (finding culpable conduct where defendant refused to accept service and respond to complaint in a timely manner); Rios, 2015 WL 5161314, at *7 (finding culpable conduct where defendants failed to answer, appear or plead).

Nonetheless, Defendants resort to arguing (unsupported by any affidavit or evidence) that their conduct was not culpable because it was caused by FCC's scheme to sue Exeter quickly in violation of the Contract and before Defendants could raise "sufficient funds to defend the action" and hire counsel. Brief at 9.

As an initial matter, Defendants' post-hac claim they could not afford to retain counsel is false because as Defendants admit, FCC had paid Exeter for its work. Defendants admit that all

work was "paid for by FCC" and FCC "timely paid all pay applications." Brief at 7. Indeed, prior to termination, FCC had paid Exeter almost $400,000. Tellingly, Defendants' counsel has been representing them since before this lawsuit was filed. On September 11, 2015 Defendants' current counsel wrote a letter to FCC stating in the first line "that this law firm represents Exeter Construction, LLC." Motion at Exhibit C. The day after FCC filed the Complaint, Defendants' counsel contacted FCC's counsel to discuss a settlement meeting and that same counsel attended the settlement meeting on October 6, 2015. At no time did Ballard or his counsel inform FCC that Ballard was not represented by this counsel or any counsel.

Also, Defendants' claim that FCC somehow violated the Contract is also false. Article 29.1 of the Contract provides:

> If the Parties, negotiating in good faith, fail to reach an agreement within the [fifteen (15) Business Days] period of time set forth above in Section 29.1, then Owner and Contractor agree that any and all disputes arising from, relating to or in connection with the Agreement, whether based on contract, tort or otherwise shall be submitted to the jurisdiction of the federal or state courts located in the Commonwealth of Pennsylvania….

Complaint at Exhibit A, Contract at Article 29.1. On July 28, 2015, FCC provided Defendants with written notice of its claims. See id. at ¶ 71. Rather than negotiate with FCC in good faith during the fifteen business day period of time provided by Article 29.1, Defendant's Counsel sent a letter on September 11, 2015, rejecting all FCC's claims and threatening to file lien if FCC did not pay Exeter money. Motion at Exhibit C. As such, FCC was left with no choice but to file the Complaint on September 28, 2015 to recover the significant damages Defendant had caused. Even after filing the Complaint, FCC agreed to attend a settlement meeting where they attempted to negotiate a resolution to the dispute. It is simply false that FCC rushed to court in violation of the Contract without attempting to negotiate a resolution to this dispute.

In any event, even if Defendants' preposterous claims were true (which they are not), the failure to obtain counsel (for any reason) and totally disregarding the legal process is culpable conduct. See, e.g., Rios, 2015 WL 5161314, at *7 (finding culpable conduct where defendants failed to answer, appear or plead and when defendants' attorney withdrew for failure to pay, defendants never retained new counsel). Indeed, if failure to obtain counsel and ignore the legal process was excusable, it would "permit delay in every case." Residential Reroofing Union Local 30-B v. Mezicco, 55 F.R.D. 516, 518 (E.D. Pa. 1972) ("[A]ction was filed in this court and totally ignored by the defendant. Repeated notices were given to defendant. Eventually, defendant refused to accept proper notices sent to him by certified mail. To say that there was excusable neglect because defendant was unaware of the necessity to obtain counsel would be to permit delay in every case."). [3]

Ballard has avoided FCC's attempt to serve the Complaint on him via certified mail and then ignored the Complaint once FCC affected personal service. Neither Ballard nor his counsel ever requested an extension of time to respond to the Complaint. Instead, Ballard continued with his long pattern of foot-dragging and delay, just as he has done repeatedly in Delaware for over a decade. This culpable conduct is another reason why the Motion should be denied.

## CONCLUSION

For all the above-stated reasons, Plaintiff requests the Motion be denied. In the event the Court grants the Motion (which it should not), Plaintiff requests it be awarded the attorneys' fees it incurred to draft and file its request for default and prepare a default judgment motion and brief.

---

[3] See also Titus, 51 F.R.D. at 227 (denying motion to set aside default where defendant alleged he did not realize that he had to retain counsel).

- 18 -

| | |
|---|---|
| Dated:  December 14, 2015 | /s/ William D. Wickard |

Jason L. Richey, Esquire
Pa. I.D. # 78943
William Wickard, Esquire
Pa. I.D. # 87741

K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222
Tel.:  (412) 355-6260

*Counsel for Plaintiff*
*Federal Carbide Company*

**CERTIFICATE OF SERVICE**

      I hereby certify that on December 14, 2015, a copy of foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the following individuals and all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

                Matthew Jameson, III, Esq.
                Robert M. Palumbi, Esq.
                Babst, Calland, Clements and Zomnir, P.C.
                Two Gateway Center, 7th Floor
                603 Stanwix Street
                Pittsburgh, PA  15222


                /s/ William D. Wickard