IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL CARBIDE COMPANY

Plaintiff

v.

EXETER CONSTRUCTION, LLC., and

DENNIS B. BALLARD

Defendants

Civil Action No. 3. 3:15-cv-248

Judge Kim R. Gibson

## DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF EXETER CONSTRUCTION, LLC.

AND NOW, comes Defendants, Exeter Construction, LLC ("Exeter") and Dennis B. Ballard ("Ballard") by its counsel Babst, Calland, Clements and Zomnir, P.C., and files the following Answer and Affirmative Defenses to the Complaint along with Exeter's Counterclaim as follows:

### OVERVIEW

1.      Exeter and Ballard admit only that Exeter represented to FCC that it was qualified to manage the design, procurement, and construction of a manufacturing facility, warehouse space, and office space for FCC to manufacture Tungsten Carbide and Tungsten Heavy Alloy components near Tyrone, Pennsylvania (the "Project"). It is denied Ballard made any representations in his individual capacity, and all times acted as Exeter. Except as admitted, the allegations of Paragraph 1 of the Complaint are introductory legal conclusions to which no response is required. To the extent a response is deemed to be required, Exeter and Ballard deny the allegations in Paragraph 1.

2.      Denied as stated. The allegations of Paragraph 2 attempts to paraphrase terms of the Contract, the same which speaks for itself, and any allegations inconsistent with the terms of

the Contract are denied. By way of further response, FCC had certain obligations it was to perform, and Exeter was not responsible for managing "all" elements of the design, procurement and construction of the Project.

3.      It is specifically denied that Ballard, in his individual capacity, made any representations to FCC. It is denied that Exeter was not qualified for the Project. It is admitted Ballard, in his individual capacity, never designed and constructed a facility such as the Project. It is admitted that Exeter, being a new company, had ever designed and constructed a facility such as the project.

4.      The allegations of Paragraph 4 of Plaintiff's Complaint are denied.

5.      Exeter and Ballard admit only that FCC terminated the contract on July 28, 2015. The remaining allegations of Paragraph 5 are denied as stated.

6.      The allegations of Paragraph 6 are legal conclusions to which no response is required. To the extent a response is required, the allegations of this Paragraph are denied.

## PARTIES

7.      Admitted.

8.      Admitted.

9.      Admitted.

## JURISDICTIONAND VENUE

10.      Admitted.

11.      The allegations of Paragraph 11 are admitted in part. It is admitted only that Exeter transacted business in this State. The remaining allegations are denied.

12.      Admitted.

{B2492631.1}

## FACTUAL BACKGROUND

13.    After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 13 of the Complaint and on that basis denies the allegations.

14.    After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 14 of the Complaint and on that basis denies the allegations.

15.    After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 15 of the Complaint and on that basis denies the allegations.

16.    The Defendants admit only that FCC approached Exeter in August of 2014 regarding its ability to manage the design, procurement, and construction of the project. The remaining allegations of Paragraph 16 of the Complaint are denied.

17.    The Defendants admit only that FCC informed Exeter of its desires. The remaining allegations of Paragraph 17 of the Complaint are denied.

18.    The allegations of Paragraph 18 of Plaintiff's Complaint are denied.

19.    It is specifically denied that Ballard, in his individual capacity, made any representations to FCC or FCC's employees. The remaining allegations of this Paragraph are denied.

20.    The allegations of Paragraph 20 of the Complaint are denied.

21.    The allegations of Paragraph 21 of the Complaint are denied.

22.    The allegations of Paragraph 22 of the Complaint are denied.

23.    The allegations of Paragraph 23 of the Complaint are denied.

24.     The allegations of Paragraph 24 of the Complaint are denied.

25.     The allegations of Paragraph 25 of the Complaint are denied. It is specifically denied that Ballard, in his individual capacity, made any representations to FCC.

26.     After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 26 of the Complaint and on that basis denies the allegations.

27.     The allegation of Paragraph 27 of the Complaint is denied.

28.     The allegations of Paragraph 28 are admitted in part and denied in part. It is admitted Exeter never completed work on the Dover Air Force Base Project. It is denied Ballard or Exeter represented Exeter completed the Dover Air Force Base Project. By way of further response, Ballard notified FCC that Ballard Builders LLC had completed a project at the Dover Air Force Base.

29.     It is admitted that Exeter is not a registered federal contractor and that Exeter has not had any federal contracts. After reasonable investigation, the Defendants are without knowledge and information sufficient to form a belief as to what publicly available information FCC is relying upon, and therefore denies the remaining allegations of Paragraph 29.

30.     Admitted.

31.     The allegations of Paragraph 31 of Plaintiff's Complaint are denied.

32.     The allegations of Paragraph 32 are denied.

33.     The allegations of Paragraph 33 of the Complaint are denied.

34.     After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief regarding the truth of the allegations in Paragraph 34 of the Complaint and on that basis denies the allegations.

35.    It is admitted that Defendants never "informed FCC that Exeter was not a full service contractor and that it was essentially a shell company comprised of Ballard." By way of further reply, it is denied Exeter was not a full service contractor and it is denied that Exeter was a shell company comprised of Ballard.

36.    After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief regarding the truth of the allegations in Paragraph 36 alleging FCC entered the Contract with Exeter as a result of the Defendants' representations. On that basis, the Defendants deny this allegation. It is admitted FCC and Exeter entered into contract on the date stated.

37.    After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief regarding the truth of the allegation in Paragraph 37. On this basis, the Defendants deny the allegations.

38.    Paragraph 38 of Plaintiff's Complaint does not require a response as it merely restates selected portions of a document, which speaks for itself. The Defendants deny any allegations in Paragraph 38 that are inconsistent with or a misstatement of the contents of the document referenced.

39.    Paragraph 39 of Plaintiff's Complaint does not require a response as it merely restates selected portions of a document, which speaks for itself. The Defendants deny any allegations in Paragraph 39 that are inconsistent with or a misstatement of the contents of the document referenced.

40.    Paragraph 40 of Plaintiff's Complaint does not require a response as it merely restates selected portions of a document, which speaks for itself. The Defendants deny any

allegations in Paragraph 40 that are inconsistent with or a misstatement of the contents of the document referenced.

41.     Paragraph 41 of Plaintiff's Complaint does not require a response as it merely restates selected portions of a document, which speaks for itself. The Defendants deny any allegations in Paragraph 41 that are inconsistent with or a misstatement of the contents of the document referenced.

42.     Paragraph 42 of Plaintiff's Complaint does not require a response as it merely restates selected portions of a document, which speaks for itself. The Defendants deny any allegations in Paragraph 42 that are inconsistent with or a misstatement of the contents of the document referenced.

43.     After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegation regarding FCC's reasoning behind including a liquidated damages provision in the contract. The Defendants deny any allegations in Paragraph 43 that are inconsistent with or a misstatement of the contents of the document referenced.

44.     It is admitted that FCC issued a Notice to Proceed to Exeter on September 11, 2014. It is further admitted that at the time the Notice to Proceed was issued, Exeter and FCC contractually agreed to a Substantial Completion date of March 30, 2015.

45.     Admitted.

46.     The allegations of Paragraph 46 of Plaintiff's Complaint are denied.

47.     The allegations of Paragraph 47 of Plaintiff's Complaint are denied.

48.     The allegations of Paragraph 48 of Plaintiff's Complaint are denied.

49.     The allegations of Paragraph 49 of Plaintiff's Complaint are denied.

50.     The allegations of Paragraph 50 of Plaintiff's Complaint are denied.

51.     The allegations of Paragraph 51 of Plaintiff's Complaint are denied.

52.     After reasonable investigation the Defendants lack knowledge and information sufficient to form a belief as to the truth of FCC's allegation that it was forced to pay over $20,000 directly to Snyder Township and Bureau Veritas in Huntington, Pennsylvania for permits. As such, these allegations are denied. It is admitted Exeter invoiced FCC and FCC paid Exeter $10, 0000.00 to obtain permits.

53.     The allegations of Paragraph 53 of Plaintiff's Complaint are denied.

54.     After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to the truth of FCC's allegation that it was forced to pay over $50,000 directly to the electric company. As such, this allegation is denied. The remaining allegations of Paragraph 54 are denied.

55.     It is admitted only that Exeter damaged roughly $2,000.00 worth of steel sheeting while removing it from a vendor's truck. It is denied Exeter never made any attempt to replace the damaged goods.

56.     The allegations of Paragraph 56 of Plaintiff's Complaint are denied.

57.     The allegations of Paragraph 57 of Plaintiff's Complaint are denied.

58.     The allegations of Paragraph 58 of Plaintiff's Complaint are denied.

59.     It is denied that FCC consistently paid Exeter in a timely fashion. The remaining allegations of Paragraph 59 are denied.

60.     It is denied Exeter failed to pay its subcontractors and vendors. It is denied the Project was substantially delayed. After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to the truth of FCC's allegation that it was forced to

directly pay Exeter's suppliers and vendors substantial sums of money. For this reason, these allegations are denied.

61.     The allegations of Paragraph 61 of Plaintiff's Complaint are denied.

62.     The allegations of Paragraph 62 of Plaintiff's Complaint are denied.

63.     The allegations of Paragraph 63 of Plaintiff's Complaint are admitted in part and denied in part. It is admitted that the Contract's Completion date was initially March 30, 2015. It is denied that on March 30, 2015 the Project was required to be completed. By way of further response, FCC had agreed to four (4) change orders in November of 2014 which required significant work and cost, and added three-hundred-fifteen (315) days to the date of substantial completion. As such, the date of substantial completion was February 8, 2016.

64.     The allegations of Paragraph 64 of Plaintiff's Complaint are denied.

65.     It is denied Ballard, in his individual capacity, was under any duty to complete the Project. The remaining allegations are denied.

66.     The allegations of Paragraph 66 of Plaintiff's Complaint are denied.

67.     The allegations of Paragraph 67 of Plaintiff's Complaint are denied.

68.     The allegations of Paragraph 68 of Plaintiff's Complaint are admitted in part and denied in part. It is admitted FCC offered to have FCC's employees compete certain painting work on the steel trusses. It is admitted that Exeter did not accept FCC's offer, because such work was under contract to a subcontractor. After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to the reasons why FCC offered such services to Exeter. As such, these allegations are denied.

69.     The allegations of Paragraph 69 of Plaintiff's Complaint are admitted in part and denied in part. It is denied that Exeter ever abandoned the Project. It is admitted that on or

around July 14, 2015, Ballard went on a family vacation to Las Vegas, which FCC was aware of months in advance.

70.     The allegations of Paragraph 70 of Plaintiff's Complaint are denied.

71.     Admitted.

72.     It is admitted that Exeter received a Termination Letter from FCC on July 28, 2015. The allegations of Paragraph 72 of the Plaintiff's Complaint merely restate selected portions of that document, which speaks for itself. The Defendants deny any allegations in Paragraph 72 that are inconsistent with or a misstatement of the contents of the Termination Letter.

73.     It is admitted that Exeter received a Termination Letter from FCC on July 28, 2015. The allegations of Paragraph 73 merely restate selected portions of that document, which speaks for itself. The Defendants deny any allegations in Paragraph 73 that are inconsistent with or a misstatement of the contents of the Termination Letter. By way of further response, Paragraph 73 also references the Contract, a document which speaks for itself. The Defendants deny any allegations in Paragraph 73 that are inconsistent with or a misstatement of the contents of the Termination Letter.

74.     The allegations of Paragraph 74 of the Plaintiff's Complaint are denied.

75.     The allegations of Paragraph 75 of the Plaintiff's Complaint are admitted in part. It is admitted Exeter removed drawings and permits from the construction trailer at the Project. It is denied Exeter was trying to shut down the Project.

76.     The allegations of Paragraph 76 of the Plaintiff's Complaint are denied.

77.     The allegations of Paragraph 77 of the Plaintiff's Complaint are admitted in part and denied in part. It is admitted that on July 29, 2015, Ballard, acting on behalf of Exeter,

traveled to the Bureau Veritas facility in Huntington, Pennsylvania. All remaining allegations of Paragraph 77 are denied.

78.     The allegations of Paragraph 78 of the Plaintiff's Complaint are denied.

79.     The allegations of Paragraph 79 of the Plaintiff's Complaint are denied.

80.     The allegations of Paragraph 80 of Plaintiff's Complaint purport to reference the terms of a document, which speaks for itself and is not attached to the Complaint. Exeter denies any allegations in Paragraph 80 that are inconsistent with or a misstatement of the letter referenced but not attached.

81.     The allegations of Paragraph 81 of Plaintiff's Complaint purport to reference the terms of a document, which speaks for itself and is not attached to the Complaint. Exeter denies any allegations in Paragraph 81 that are inconsistent with or a misstatement of the letter referenced but not attached.

82.     It is admitted that Exeter has refused to compensate FCC. It is denied Exeter caused any damages. The remaining allegations of Paragraph 82 of Plaintiff's Complaint are denied.

83.     The allegations of Paragraph 83 of Plaintiff's Complaint are denied. It is specifically denied that Ballard, in his individual capacity, performed or was under a duty to perform any work.

84.     After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to the truth of the averments in Paragraph 84 of Plaintiff's Complaint. Accordingly, they are denied.

85.     After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to the truth of the averments in Paragraph 85 of Plaintiff's Complaint. Accordingly, they are denied.

86.     After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to the truth of the averments in Paragraph 86 of Plaintiff's Complaint. Accordingly, they are denied.

87.     After reasonable investigation, the Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 87 of Plaintiff's Complaint. Accordingly, they are denied.

88.     The allegations of Paragraph 88 of Plaintiff's Complaint are admitted in part. It is admitted FCC representatives were unable to reach a resolution of this dispute via negotiations with Exeter representatives. It is denied FCC had no choice but to file this lawsuit, as FCC breached the contract by filing suit after FCC agreed to meet with Exeter for a good faith negotiation, but before the meeting took place.

## COUNT 1

## FRAUDULENT INDUCEMENT

### (FCC v. Exeter and Ballard)

89.     Paragraph 89 of Plaintiff's Complaint is an incorporation paragraph which requires no response.

90.     Exeter and Ballard admit only that Exeter represented to FCC that it was qualified to manage the design, procurement, and construction of the Project. It is denied Ballard made any representations in his individual capacity, and all times acted as Exeter. The remaining allegations in Paragraph 90 are denied.

91.     The allegations of Paragraph 91 of Plaintiff's Complaint are denied.

92.     The allegations of Paragraph 92 of Plaintiff's Complaint are denied.

93.     The allegations of Paragraph 93 of Plaintiff's Complaint are denied.

94.     The allegations of Paragraph 94 of Plaintiff's Complaint are denied.

95.     The allegations of Paragraph 95 of Plaintiff's Complaint are denied.

96.     The allegations of Paragraph 96 of Plaintiff's Complaint are denied.

97.     The allegations of Paragraph 97 of Plaintiff's Complaint are denied.

98.     The allegations of Paragraph 98 of Plaintiff's Complaint are denied.

99.     The allegations of Paragraph 99 of Plaintiff's Complaint are denied.

100.    The allegations of Paragraph 100 of Plaintiff's Complaint are denied.

101.    The allegations of Paragraph 101 of Plaintiff's Complaint are denied.

WHEREFORE, Exeter and Ballard demands judgment in their favor and against FCC together with the costs of this action.

## COUNT II

### BREACH OF CONTRACT

### (FCC v. Exeter)

102.    Paragraph 102 of Plaintiff's Complaint is an incorporation paragraph which requires no response.

103.    Admitted.

104.    Denied. FCC has breached the contract by failing to pay Exeter for work performed and failing to compensate Exeter after terminating it for convenience pursuant to Section 17.3.3 of the Contract.

105.    The allegations of Paragraph 105 of Plaintiff's Complaint are denied.

106.    It is admitted only that FCC terminated Exeter. The remaining allegations of Paragraph 106 of Plaintiff's Complaint are denied.

107.    The allegations of Paragraph 107 of Plaintiff's Complaint are denied.

108.    The allegations of Paragraph 108 of Plaintiff's Complaint are denied.

WHEREFORE, Exeter demands judgment in its favor and against FCC together with the costs of this action.

## COUNT III

## BREACH OF WARRANTY

### (FCC v. Exeter)

109.    Paragraph 109 of Plaintiff's Complaint is an incorporation paragraph which requires no response.

110.    Paragraph 110 of Plaintiff's Complaint merely restates selected portions of the Contract, a document that speaks for itself, and the Defendants deny any allegations in this Paragraph that are inconsistent with the contents of the Contract.

111.    The allegations of Paragraph 111 of Plaintiff's Complaint are denied.

112.    After reasonable investigation, the Defendants lack knowledge and information sufficient to form a belief as to whether FCC relied upon Exeter's express warranties to its detriment. As such, these allegations are denied.

113.    The allegations of Paragraph 113 of Plaintiff's Complaint are denied.

114.    The allegations of Paragraph 114 of Plaintiff's Complaint are denied.

WHEREFORE, Exeter demands judgment in its favor and against FCC together with the costs of this action.

## COUNT IV

### SPECIFIC PERFORMANCE

### (FCC v. Exeter)

115.    Paragraph 115 of Plaintiff's Complaint is an incorporation paragraph which requires no response.

116.    Admitted.

117.    The allegations of Paragraph 117 of Plaintiff's Complaint are denied.

118.    The allegations of Paragraph 118 of Plaintiff's Complaint are denied.

119.    The allegations of Paragraph 119 of Plaintiff's Complaint are denied.

120.    Paragraph 120 of Plaintiff's Complaint restates selected portions of the Contract, which speaks for itself. Exeter denies any allegations in Paragraph 120 that are inconsistent with or a misstatement of the contents of the Contract.

121.    Paragraph 121 of Plaintiff's Complaint restates selected portions of a document, which speaks for itself. Exeter denies any allegations in Paragraph 121 that are inconsistent with or a misstatement of the contents of the document.

122.    The allegations of Paragraph 122 of Plaintiff's Complaint are denied.

123.    The allegations of Paragraph 123 of Plaintiff's Complaint are denied.

124.    The allegations of Paragraph 124 of Plaintiff's Complaint are denied.

125.    The allegations of Paragraph 125 of Plaintiff's Complaint are denied.

126.    The allegations of Paragraph 126 of Plaintiff's Complaint are denied.

127.    The allegations of Paragraph127 of Plaintiff's Complaint are denied.

WHEREFORE, Exeter demands judgment in its favor and against FCC together with the costs of this action.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

FCC's Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

FCC's Complaint is barred by laches and/or the applicable statute of limitations.

### THIRD DEFENSE

FCC's Complaint is barred by the doctrines of waiver, estoppel, accord and satisfaction, and set-off.

### FOURTH DEFENSE

FCC's Complaint is barred by Plaintiff's own breach of contract and/or negligence.

### FIFTH DEFENSE

FCC's Complaint fails to join necessary and/or indispensable parties to this action.

### SIXTH DEFENSE

FCC's Complaint is barred by failure of consideration and/or want of consideration.

### SEVENTH DEFENSE

FCC's Complaint is barred by the Statute of Frauds.

### EIGHTH DEFENSE

FCC's Complaint is barred by the Doctrine of Unclean Hands.

### NINTH DEFENSE

FCC's Complaint is barred by the principles of accord and satisfaction and/or settlement, compromise and release.

## TENTH DEFENSE

FCC's Complaint is barred by its failure to mitigate damages.

## ELEVENTH DEFENSE

FCC's Complaint is barred by the conduct and/or actions of third parties over whom Defendants have neither control nor right of control.

## TWELFTH DEFENSE

FCC's claims are subject to Exeter and Ballard's right to setoff and/or recoupment.

## THIRTEENTH DEFENSE

FCC's claims are barred in whole or in part by the doctrine of estoppel.

## FOURTEENTH DEFENSE

FCC's claims are barred by the doctrine of impossibility of performance.

## FIFTEENTH DEFENSE

FCC reserves the right to assert additional affirmative defenses.

## DEFENDANT, EXETER CONSTRUCTION, LLC'S COUNTERCLAIM AGAINST FEDERAL CARBIDE COMPANY

Exeter Construction, LLC ("Exeter) hereby brings the following Counterclaim against Federal Carbide Company ("FCC"), and in support thereof avers as follows:

### PARTIES

1.      The Counterclaim Plaintiff is Exeter Construction, LLC, a Delaware limited liability company having its principal place of business at 415 S. Carter Road, Smyrna, Delaware 19977.

2.      The Counterclaim Defendant is Federal Carbide Company, a New Jersey corporation with its principal place of business located at One Eagle Ridge Road, Tyrone, Pennsylvania 16686.

### JURISDICTION AND VENUE

3.      Jurisdiction and venue are proper over this counterclaim in the District where the Complaint is pending.

4.      Exeter brings its counterclaim under federal diversity jurisdiction, 28 U.S. C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

5.      Jurisdiction and venue are otherwise proper under 28 U.S.C. 1331, 1441, 1446, and 1391(b)(1) and (2).

### FACTUAL BACKGROUND

6.      In March of 2014, FCC Vice President David Avedesian ("Avedesian") observed a steel manufacturing facility in Maine which displayed the placard of the CanAm Steel Building Corporation ("CanAm").

7.     Avedesian contacted CanAm in March of 2014, inquiring about CanAm's ability to construct a similar mixed use building for FCC in Tyrone, Pennsylvania.

8.     CanAm referred Avedesian to Dennis Ballard. CanAm had worked with Dennis Ballard in his capacity as principal of Ballard Builders, LLC. Ballard Builders, LLC was a federally-registered contractor who performed work at the Dover Air Force Base and had experience in the design, procurement, and construction of commercial facilities, including mixed-use buildings.

9.     Ballard and Avedesian spoke in March of 2014 to discuss the potential design, procurement, and construction of a mixed-use manufacturing facility, warehouse space and office space for FCC (the "Project").

10.    Exeter Construction, LLC was formed on April 3, 2014.

11.    FCC and Exeter met in April of 2014 to discuss the potential Project. Present at the meeting were Avedesian, Ballard, and Andrew L. Swope ("Swope"), counsel for FCC.

12.    Exeter represented to FCC and Swope that this would be Exeter's first project. Exeter also told FCC that it would utilize similar personnel used by Ballard Builders, LLC, who had experience in the design, procurement, and construction of commercial projects, including a project at the Dover Air Force Base.

13.    At the meeting in April of 2014, FCC expressed its desire to hire Exeter to manage the design, procurement, and construction of a mixed-use building which would operate as a manufacturing facility, warehouse space, and office space for FCC in Tyrone, Pennsylvania.

14.    From April of 2014 through August of 2014, FCC and Exeter remained in close contact to discuss the potential Project. All communications during this time frame were between Exeter, FCC, and Swope.

15.     From April of 2014 through August of 2014, FCC had the opportunity to perform whatever due diligence on Dennis Ballard, Ballard Builders, LLC, and Exeter that they deemed necessary and/or appropriate.

16.     In August of 2014, Avedesian advised Exeter that if an agreement was reached, Exeter's dealings would be with David Avedesian of FCC. David Avedesian represented to Exeter that FCC President Craig Avedesian was incompetent and incapable of understanding the complexity of the Project.

17.     On September 11, 2014, FCC entered into a "Design-Build Agreement for Engineering, Procurement, and Construction Services" (the "Contract") with Exeter for $1,759,784.00. The Contract tasked Exeter with the design and build of an 80' x '300 mixed-use building which would act as a manufacturing facility, warehouse space, and office space in Tyrone, Pennsylvania. (Exhibit A).

18.     Consistent with Avedesian's representation to Exeter, the Contract listed David Avedesian as the contact for FCC and did not mention FCC President Craig Avedesian.

19.     FCC advised Exeter the construction would take place on a 10.13 acre parcel of property which was zoned as industrial. The site had an address of 1 Eagle Ridge Road, Tyrone, Pennsylvania.

20.     FCC issued a Notice to Proceed to Exeter on September 11, 2014, requiring substantial completion within 200 days, or by March 30, 2015. FCC also issued Exeter a $50,000.00 deposit, which was the basis for Payment Application #1. (Exhibit B, Payment Applications 1-9).

21.     Almost immediately after the Notice to Proceed was issued, FCC began to actively interfere with Exeter's performance of the Contract and its ability to begin construction.

{B2492631.1}

22.     Avedesian expressed concern to Exeter that the contractually agreed upon mixed-use building was not going to be large enough to satisfy FCC's needs.

23.     In early October of 2014, FCC notified Exeter it wished to substantially expand upon the mixed-use building and significantly upgrade the size of the Project.

24.     FCC's desire to significantly alter the contractually-agreed upon scope of work for the Project negatively impacted and delayed Exeter's ability to proceed with its work. Exeter had difficulty representing to subcontractors and potential subcontractors what the scope of the work would be, since it was expanding on an ongoing basis.

25.      Despite Exeter's knowledge that FCC wished to significantly expand the Project and thereby alter the Contract between the parties, Exeter was not provided with a specific plan of action or notified how FCC wished to expand the facility.

26.     FCC did not own sufficient real estate to construct the desired expansion of the Project.

27.     On November 12, 2014, FCC, through its holdings company Carney Limited, LP, purchased two parcels of property adjacent to the FCC property where the originally intended Project was to be built. (Exhibit C).

28.     FCC represented to Exeter that the two parcels of property would provide the additional space required for FCC's expansion of the Project.

29.     In Mid-November of 2014, FCC ordered Exeter to perform significant additional work which was outside the scope of the original Contract. Specifically, FCC ordered Exeter to construct an additional two-story office building.

30.     Exeter advised FCC that such a significant change would require additional architectural design, excavation, site work, and materials, which would require additional time and money for Exeter to complete the significantly-expanded scope of work.

31.     Exeter prepared four (4) change orders to reflect the substantial changes and additional costs. Change Order 1 was for the architectural design of the new two-story office building at a cost of $45,600.00 and extended the date of substantial completion by sixty days. (Exhibit D, all Change Orders).

32.     Change Order 2 was for the additional site work required to construct the new building, and included stripping of soils, paving, and excavation at a cost of $394,546.80. Change Order 2 extended the date of substantial completion by sixty days. (Exhibit D).

33.     Change Order 3 was for the build of the 7,200 square foot office building at a cost of $98.00 per square foot, totaling $705,600.00. Change Order 3 extended the date of substantial completion by ninety days. (Exhibit D).

34.     Change Order 4 was for the installation of an elevator within the two-story building at a cost of $45,600.00. Change Order 4 extended the date of substantial completion by fifteen days. (Exhibit D).

35.     The four change orders totaled $1,191,246.80, bringing the total contract amount to $2,951,130.80.

36.     The four change orders added 315 days to the date of substantial completion.

37.     The date of Substantial Completion was moved from March 30, 2015 to February 8, 2016.

38.     All four change orders were submitted in Mid-November of 2014 based upon the order, direction, and authorization of FCC to construct an additional two-story office building.

39.     The change orders were submitted directly to David Avedesian for review and consideration.

40.     Avedesian orally approved the change orders and change order amounts in Mid-November of 2014 and directed Exeter to complete the work as requested.

41.     FCC's request and approval of the change order work fundamentally altered the Contract and the time for Substantial Completion.

42.     Exeter made FCC aware that the fundamental alteration of the Contract would require Exeter to order more supplies and materials for the change order work and would require additional time for Exeter to complete the greatly expanded scope of work for the Project.

43.      In reliance on FCC's approval, Exeter significantly altered and upgraded its order of steel and building materials from CanAm on November 26, 2014. (Exhibit E, Can Am Orders).

44.     On September 12, 2014, in reliance on FCC's approval of the change orders, Exeter ordered steel and materials from CanAm totaling $294,834.00 for construction of the originally intended 80' x 300' building. (Exhibit E).

45.     FCC was aware of Exeter's initial steel and materials order from CanAm.

46.     On November 26, 2015, in reliance on FCC's approval of the change orders, Exeter increased its order with CanAm to $430,673.00 to include additional steel and materials for the new 7,200 square foot office building. (Exhibit E).

47.     FCC was aware of Exeter's subsequent order to CanAm based upon the change order work and received copies of invoices detailing the additional materials and supplies.

48.     After FCC materially altered the Contract and the time frame for completion, Exeter continued with its work.

49.     On November 25, 2014, Exeter submitted Payment Application #2 for payment of $154,456.80. FCC made timely payment. (Exhibit B, all Payment Applications).

50.     On February 9, 2015, Exeter submitted Payment Application #3 for payment of $36,630.00. FCC made timely payment. (Exhibit B).

51.     On May 1, 2015, Exeter submitted Payment Application #4 for payment of $341,343.20. FCC made timely payment. (Exhibit B).

52.     On May 7, 2015, Exeter submitted Payment Application #5 for payment of $61,458.19. FCC made timely payment. (Exhibit B).

53.     Exeter's work on the Project was proceeding as scheduled. Exeter was on pace for a timely completion prior to February 8, 2016.

54.     Exeter and FCC's working relationship was amicable. Exeter principle Dennis Ballard became personal friends with Avedesian, as the two would frequently meet for dinner and play golf together in the Tyrone, Pennsylvania area.

55.     On June 14, 2015, Exeter submitted Payment Application #6 for payment of $78,255.00. This Payment Application notably included payment for Exeter's change order work. FCC made timely payment. (Exhibit B).

56.     On July 1, 2015, Exeter submitted Payment Application #7 for payment of $109,085.31. This Payment Application also included payment for Exeter's change order work. FCC made timely payment. (Exhibit B).

57.     FCC accepted Exeter's change order work, along with the additional time allotted for Substantial Completion, through its approval and payment of payment applications 6 and 7.

58.     As of July 1, 2015, Exeter's work was proceeding as scheduled and it was on pace for a timely completion prior to February 8, 2016.

59.     Exeter had previously completed substantial site work in preparation for the construction of the new two-story building. After July 1, 2015, Exeter had also ordered and received substantial amounts of steel, building materials, and insulation required for the Project.

60.     On July 28, 2015, Exeter was on the Project site coordinating the power washing and painting of steel and preparing the insulation materials recently received.

61.     On July 28, 2015, Exeter noticed masonry and concrete subcontractor Kish Valley performing work outside the scope of its subcontract.

62.     When questioned, Kish Valley told Exeter it was performing work pursuant to a new and separate contract it had entered into directly with FCC through FCC President Craig Avedesian.

63.     Exeter received a letter of termination from FCC on July 28, 2015, signed by FCC President Craig Avedesian. (Exhibit F).

64.     Notably, this was FCC President Craig Avedesian's first contact with Exeter on the Project.

65.     In its termination letter, FCC claimed Exeter 1) failed to achieve substantial completion by March 30, 2015; 2) failed to pay debts as they became due; and 3) failed to prosecute the work.

66.     Exeter's date for Substantial Completion was extended to February 8, 2016 by virtue of the substantial change order work was acknowledged by FCC through payment and performance. Accordingly, FCC did not have a basis to terminate Exeter for failure to achieve substantial completion.

67.     Exeter did not fail to pay its debts as they became due.

68.     Exeter did not fail to prosecute the work.

69.     It is believed and therefore averred that Exeter's termination was related to an internal corporate struggle between FCC Vice President David Avedesian and FCC President Craig Avedesian related to the cost of the Project and whether Craig Avedesian agreed with David Avedesian's directive to Exeter to construct the second building.

70.     FCC's termination of Exeter for cause was improper and constituted a termination for convenience pursuant to Section 17.3.3 of the Contract.

71.     After notice of its termination, Exeter submitted Payment Application #8 to FCC on August 1, 2015 for payment of $635,044.96. (Exhibit B).

72.     For the first time on the Project, FCC refused to make payment on a Payment Application. FCC has also wrongfully refused to release $35,412.15 in retention now owed to Exeter.

## COUNT 1

### BREACH OF CONTRACT

73.     The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

74.     On September 11, 2014, FCC and Exeter entered into a Contract for Exeter to design and build a mixed-use building for use by FCC as a manufacturing facility, warehouse space, and office space for $1,759,784.00. (Exhibit A).

75.     In November of 2014, FCC materially altered the contract and the time frame for completion by directing and approving $1,191,346.80 in change order work for the construction of an additional two story office building.

76.     FCC's authorization and acceptance of the change orders added 315 days to the date of Substantial Completion, making the Substantial Completion date February 8, 2016.

77.   FCC's material alteration substantially modified the original Contract work, making Exeter's performance a new and substantially different undertaking.

78.   FCC's authorization of the change order work is evidenced through its November 12, 2014 acquisition of additional real property necessary to construct the new building subject to the change order work.

79.   FCC's authorization of the change order work is evidenced through Exeter's November 26, 2014 revision to its steel and building materials order, whereby Exeter substantially increased the amount of building materials purchased for use on the Project.

80.   FCC's acceptance of the change order work is established through its partial payment to Exeter on the change order work in Payment Applications #6 and #7.

81.   FCC materially breached its obligations under the Contract by wrongfully terminating Exeter on July 28, 2015, despite a date of Substantial Completion of February 8, 2016.

82.   FCC's termination of Exeter for cause was improper and therefore must be converted to a termination for convenience pursuant to Section 17.3.3 of the Contract.

83.   Based on FCC's termination of Exeter for convenience, pursuant to Section 18.1.2 of the Contract,   Exeter is entitled to "compensation for the Work performed through the effective date of termination Contractor's actual, demonstrable and reasonable costs in performing the Agreement plus reasonable overhead not to exceed ten percent (10%) on the work actually performed, plus Subcontractors' cancellation charges in connection with such termination and all Contractor and Subcontractor reasonable demobilization and winding-up costs incurred after the effective date of termination…"

84. FCC has refused to recognize its actions as a termination for convenience, and has refused to make payment to Exeter pursuant to Section 18.1.2 of the Contract.

85. As a direct and proximate cause of FCC's breach of the Contract, Exeter has suffered significant damages and is entitled to all such damages under the Contract, including the amounts due and owing from Payment Applications #8 and retention.

86. Pursuant to Article 29.1 of the Contract, Exeter is also entitled to its attorney's fees, costs, and expenses incurred in connection with this legal action.

**WHEREFORE,** Counterclaim Plaintiff Exeter respectfully requests that this Court enter Judgment in its favor and against FCC for $670,457.11, plus interest, costs, and attorneys' fees, together with any further and additional relief that this Court may deem just and proper.

## COUNT 2

### UNJUST ENRICHMENT

87. The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

88. In the alternative to Exeter's breach of contract claim, FCC is liable to Exeter for unjust enrichment.

89. FCC, upon its own volition, decided to fundamentally change the scope of the Contract and the Project in early October of 2014.

90. FCC substantially expanded the scope of the Project by adding a two-story office building which was outside the scope of the Contract.

91. As evidence of its intentions, FCC secured additional property adjacent to the original Project site on November 12, 2014 to accommodate the extra work.

92.     In Mid-November of 2014, Exeter provided FCC with four proposed change orders detailing the work required and cost of such work.

93.     FCC's Vice President, David Avedesian, orally approved the change order work and directed FCC to proceed with the work.

94.     With FCC's knowledge and approval, Exeter significantly upgraded its steel and materials orders from CanAm on November 26, 2014 for purposes of performing the additional change order work.

95.     Exeter conferred substantial benefits on FCC in the form of labor, materials, and services for the additional change order work.

96.     FCC acknowledged Exeter's change order work in Payment Applications #6 and #7, and made partial payment toward the change order work.

97.     FCC refused to pay Exeter for the remainder of the change order work.

98.     FCC has appreciated and accepted the substantial benefits conferred upon it by Exeter's labor and materials.

99.     FCC's retention of the substantial benefits conferred by Exeter without full payment to Exeter is unjust and inequitable.

100.    Exeter is entitled to recover the reasonable amount of the labor and materials accepted and appreciated by FCC.

101.    It would be inequitable for FCC to retain the benefits without compensating Exeter.

102.    FCC is liable to Exeter for unjust enrichment, as Exeter conferred benefits on FCC in the form of labor and materials which FCC accepted, retained, and appreciated despite failing to timely and fully make payment for the same.

**WHEREFORE,** Counterclaim Plaintiff Exeter respectfully requests that this Court enter Judgment in its favor and against FCC for $670,457.11, plus interest, costs, and attorneys' fees, together with any further and additional relief that this Court may deem just and proper.

## COUNT 3

## CONTRACTOR AND SUBCONTRACTOR PAYMENT ACT

103.    The allegations contained in the foregoing paragraphs are incorporated by reference as though fully set forth below.

104.    The Project and the Contract are governed by, and subject to, Pennsylvania's Contractor and Subcontract Payment Act, 73 P.S. § 501, *et. seq.* ("CASPA")

105.    FCC is an "owner" within the meaning of CASPA.

106.    Exeter is a "contractor" within the meaning of CASPA.

107.    Pursuant to CASPA, "[p]erformance by a contractor or a subcontractor in accordance with the provisions of a contract shall entitle the contractor or subcontractor to payment from the party with whom the contractor or subcontractor has contracted." 73 P.S. § 504.

108.    FCC has failed to make timely and complete payment to Exeter for its work on the Project.

109.    FCC's failure to timely pay Exeter in accordance with the terms of the Contract is a violation of CASPA.

110.    At no time during or after Exeter's performance under the Contract did FCC provide any notice to Exeter of any alleged defects in the work performed or the materials provided, as required by law in order for FCC to lawfully and validly withhold payment from Exeter. 73 P.S. § 511.

{B2492631.1}

111.    FCC's material breaches of the Contract have forced Exeter to initiate this claim to recover the amounts due under the Contract and CASPA, and as such, Exeter is entitled to penalty interest at the rate of one percent (1%) per month on the amount sought hereunder together with its reasonable attorneys' fees, costs and expenses. 73 P.S. § 512.

**WHEREFORE,** Exeter respectfully requests that this Court enter Judgment in its favor and against FCC for $670,457.11, together with penalty interest and attorneys' fees and expenses due pursuant to CASPA, together with any other relief deemed just and equitable by this Honorable Court.

Respectfully Submitted,

*/s/ Robert M. Palumbi, Esq.*

Dated:  March 14, 2016                        D. Matthew Jameson III, Esq.
                                              PA ID No. 67764
                                              Robert M. Palumbi Esquire
                                              PA ID No. 307774

                                              Babst, Calland, Clements and Zomnir, P.C.
                                              Firm PA ID No. 812
                                              Two Gateway Center, 7th Floor
                                              603 Stanwix Street
                                              Pittsburgh, PA  15222
                                              412.394.5400

                                              Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on March 14th 2016 I electronically submitted the foregoing document to the Clerk of the Court for the United States District Court for the Western District of Pennsylvania, using the electronic case files system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to the following individuals who, by rule, have consented to accept the Notice as service of this document by electronic means:

Jason L. Richey, Esquire
William Wickard, Esquire
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania 15222

*Counsel for Plaintiff Federal Carbide Company*

*/s/ Robert M. Palumbi, Esq.*