IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL CARBIDE COMPANY

                Plaintiff

   v.

EXETER CONSTRUCTION, LLC., and

DENNIS B. BALLARD

                Defendants

Civil Action No. 3. 3:15-cv-248

Judge Kim R. Gibson

## BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS

AND NOW, comes Defendants, Exeter Construction, LLC ("Exeter") and Dennis B. Ballard ("Ballard") by its counsel Babst, Calland, Clements and Zomnir, P.C., and files the following Brief in Opposition to Plaintiff Federal Carbide Company's ("FCC") Motion Dismiss:

## I.    INTRODUCTION

Contrary to FCC's claim that Exeter cannot maintain its causes of action against it, Exeter's pleading includes facts sufficient to state claims for relief that are plausible on their face and, accordingly, meet the pleading requirements of the Federal Rules of Civil Procedure. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).

As pled, Exeter's claims allow this Court to draw the reasonable inference that (1) FCC materially altered the terms of the contract through its actions and conduct; (2) FCC accepted the material alteration of the contract through its payment for additional work; (3) FCC breached the contract with Exeter and terminated it for convenience; (4) FCC violated Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501, *et. seq.* ("CASPA") by wrongfully withholding payment for work Exeter performed; and in the alternative, (5) FCC was unjustly enriched by the labor and materials Exeter supplied.

FCC's Motion to Dismiss ("Motion") argues all of Exeter's claims must fail because (1) they are barred by the attached "Contractor's Partial Release of Claims" ("Releases"); (2) Exeter failed to comply with the contract's requirements for amending and modifying the contract; (3) Exeter failed to fulfill a condition precedent and is not entitled to payment; and (4) the parties' relationship is governed by an express contract which bars an unjust enrichment claim.    FCC's Motion fails for both procedural and substantive reasons.

FCC's Motion attempts to impermissibly litigate the entire merits of this lawsuit via a Rule 12(b) (6) motion. In doing so, FCC ignores material facts alleged in the Counterclaim and disregards and misapplies the standard for Rule 12(b) (6) and other applicable law, all of which cause FCC's motion to be devoid of merit. FCC's Motion relies upon attached Releases as exhibits it purports were part of the contract and were required to be submitted pursuant to the contract. The attached Releases are not appropriately considered at this time because they are extraneous to Exeter's allegations, not integral or relied upon by Exeter, and not part of the contract. FCC's Motion improperly imposes a heightened standard of pleading upon Exeter by engaging in a discussion of facts and defenses to the Releases that are beyond the allegations of the Counterclaim. FCC's Motion may be properly denied on this basis alone.

The Releases also have been waived by FCC's conduct. As discussed below, FCC did not request or require a signed release prior to making payment on payment applications 1-4 from September of 2014 through May of 2015. The three Releases attached were executed *after* Exeter received payment. The course of dealing between the parties demonstrates that payment was *never* predicated upon FCC's receipt of a signed release. As such, FCC's argument that the signed Release is a condition precedent to payment was waived by its conduct and actions.  FCC relies upon the Release to assert Exeter is not owed money for payment application #8 when this

would be the *first* time FCC required a Release before payment. FCC's termination of Exeter was a breach of the contract and payment is due and owing on the remaining payment applications based upon the course of conduct established by the parties. Exeter has sufficiently pled a breach of contract claim and FCC has failed to make timely payment in violation of CASPA.

FCC's reliance on the No Oral Modification ("NMO") and No Change in Work ("NCW") clauses in the contract is similarly flawed. FCC argues Exeter is precluded from bringing a breach of contract action because the date of substantial completion was March 30, 2015 and Exeter performed change order work at "its own risk and expense" without appropriately amending or modifying the contract. As discussed below, FCC's conduct beginning in October of 2014 demonstrates its intent to substantially expand upon the Project and extend the date of substantial completion. FCC's actions further altered and/or waived the requirement that an amendment or change in the contract be made in writing.

Finally, FCC's argument seeking a dismissal of Exeter's unjust enrichment claim confuses the fact that while Exeter may not *recover* on both a breach of contract and unjust enrichment claim, it may certainly plead both at this time. FCC's argument assumes the existence of an express written contract which governs all aspects of the parties' relationship. Because the parties dispute whether the written agreement governs the conduct of all actions performed on the Project, Exeter can properly plead a cause of action for unjust enrichment.

Upon review of the respective pleadings and exhibits attached thereto, the Motion should be denied. However, if this Court should determine that it is necessary to consider other facts and allegations included and attached by FCC's Motion and this Brief, the Motion may be treated as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and

should still be denied for the reasons stated herein. (*See SBRMCOA, LLC v. Bayside Resort, Inc.,* 707 F.3d 267, 272-273 (3d Cir. 2013).   Alternatively, should this Court find it needs more information about Exeter's claims at this stage of the litigation, Exeter respectfully requests leave to amend its claims to include the additional information set forth in this Brief as well as other information it may obtain from FCC through discovery.

## II.      FACTUAL ALLEGATIONS AND BACKGROUND

Plaintiff filed its Complaint against Defendants Exeter and Dennis Ballard ("Ballard") on September 28, 2015, alleging causes of action against Exeter for fraudulent inducement, breach of contract, breach of warranty, and specific performance.[1] This lawsuit arises out of Exeter's design, procurement and construction of a manufacturing facility, warehouse, and office space for Plaintiff FCC (the "Project").   On March 14, 2016, Exeter and Ballard filed its Answer, Affirmative Defenses and Counterclaim against Plaintiff FCC, alleging breach of contract, violation of CASPA, and unjust enrichment due to its wrongful termination from the project.

By way of background, on September 11, 2014, FCC entered into a "Design-Build Agreement for Engineering, Procurement, and Construction Services" (the "Contract") with Exeter for $1,759,784.00. (Counterclaim ("CC"), ¶ 17).  The Contract tasked Exeter with the design and build of an 80'x300' mixed-use building which would act as a manufacturing facility, warehouse space, and office space in Tyrone, Pennsylvania. (CC, ¶17). The Contract listed FCC Vice President David Avedesian ("Avedesian") as the contact for FCC, consistent with Avedesian's prior representations that FCC President Craig Avedesian was incompetent and incapable of understanding the Project. (CC, ¶¶ 18, 16).

---

[1] Dennis Ballard was also sued in his individual capacity for fraudulent inducement. The Counterclaim was asserted on behalf of Exeter only.

FCC issued a Notice to Proceed to Exeter on September 11, 2014, requiring substantial completion within 200 days, or by March 30, 2015. (CC, ¶ 20). Exeter also submitted Payment Application #1 to FCC. (CC ¶ 20). Exeter did not include a Release with its Payment Application #1. FCC did not require or provide a Release prior to or after payment. FCC made payment of $50,000.00 to Exeter. Almost immediately after Exeter received the Notice to Proceed, FCC began to actively interfere with Exeter's performance of the Contract. (CC, ¶ 21). Avedesian expressed concern that the agreed upon mixed-use building was not large enough to satisfy FCC's needs. (CC, ¶ 22). In early October of 2014, FCC, through Avedesian, told Exeter it wanted to expand upon the mixed-use building and significantly upgrade the size of the Project. (CC, ¶ 23).

Avedesian and Exeter spoke at length about this course of action and how it would delay Exeter from developing a construction schedule, retaining subcontractors, obtaining supplies, and proceeding with the work. (CC, ¶ 24).    Exeter requested FCC provide it with a specific plan of action detailing how FCC wanted to expand the facility. Exeter never received a specific plan of action. Instead, FCC was concerned it did not own sufficient real estate to construct the desired expansion of the Project. (CC, ¶26). In the interim, Exeter proceeded with what work it could perform without knowing the ultimate scope of the Project.   On  November  12,  2014, FCC, through its holding company Carney Limited, LP, purchased two parcels of property adjacent to the Project site and told Exeter these parcels would provide the additional space necessary for expansion. (CC, ¶ 27-28). At this time, Exeter was performing site design, engineering work and obtaining materials. Exeter was still unaware of how FCC wished to expand upon the originally intended Project.

Sometime in Mid-November of 2014, FCC, through Avedesian, orally directed Exeter to construct a 7,200 square foot two-story office building as part of FCC's expansion upon the initially intended Project (CC, ¶ 29). FCC asked Exeter what the cost would be for the building. Exeter advised FCC that such a significant change would require additional architectural design, excavation, site work, and materials. (CC, ¶30). Exeter and FCC had multiple conversations discussing how FCC's directives would cost more money and would require additional time for completion. (CC, ¶ 30). Exeter was tasked with constructing the Project, already a $1,759,784.00 undertaking, and now directed to substantially alter the scope of the Project and expand upon it after construction activities had begun.

Exeter prepared four (4) change orders to reflect the substantial changes and additional costs. (CC, ¶31). The four change orders totaled $1,191,246.80, bringing the total cost of the Project to $2,951,130.80 and added 315 days to the date of substantial completion. (CC ¶32-36). The date of substantial completion was moved from March 30, 2015 to February 8, 2016. (CC, ¶37). All four change orders were provided to FCC in Mid-November of 2014. The proposed additional work was based upon the order, direction, and authorization of FCC to construct an additional two-story office building on the land recently purchased by FCC. (CC, ¶ 38). Avedesian, acting on behalf of FCC, orally approved the change orders in Mid-November of 2014 and directed Exeter to complete the work as requested. (CC, ¶39-40). FCC's request for and approval of the change orders fundamentally altered the Contract and time for Substantial Completion. (CC, ¶41).

On November 25, 2014, Exeter submitted Payment Application #2 to FCC. Exeter did not submit the Payment Application with a Release. FCC did not request or require a Release. FCC made payment in full to Exeter on December 11, 2014. (Exhibit A, Record of Payment).

FCC's fundamental alteration of the original contract and expansion of the scope of work for the Project also impacted Exeter's previous material and supplies orders. One day after Exeter signed the Contract and was issued its Notice to Proceed in September, Exeter ordered steel and materials from CanAm totaling $294,834 for construction of the originally intended 80x300 building. (CC, ¶44).

On November 26, 2015, in reliance on FCC's approval of the change orders, Exeter increased its order with CanAm to $430,673.00 to include additional steel and materials for the new 7,200 square foot office building. (CC, ¶46).  FCC was aware of Exeter's subsequent order to CanAm, and Exeter provided invoices to FCC for the additional materials and supplies. (CC, ¶47). Work progressed slowly over the winter months due to weather delays. Nonetheless, Exeter was on pace for timely completion pursuant to the altered deadline for substantial completion. During the December and January months, Exeter performed additional site design and engineering, and also began stripping top soil in preparation for the building pad.

On February 9, 2015, Exeter submitted Payment Application #3 to FCC. (CC, ¶50). Exeter did not submit a Release with its Payment Application.  FCC did not request or require a Release at any time. FCC made payment in full to Exeter.   In the April of 2015 time frame, a materials delivery was made to the Project Site. Exeter submitted Payment Application #4 for $341,343.20 on May 1, 2015. (CC, ¶51). For the first time on the Project, Avedesian, on behalf of FCC, made payment directly to the supplier for the materials. FCC did not request or require a Release at any time.

The spring weather allowed Exeter to increase its work on the Project. Exeter began planning for the shipment of additional supplies to perform the change order work and began hiring subcontractors as a schedule became transparent. After Exeter's submission of Payment

Application #4, Avedesian requested that Exeter submit its Payment Applications twice per month so as to keep the total amounts lower but more frequent. Upon information and belief, Avedesian requested this course of action because he and FCC President Craig Avedesian began having serious disagreements over the Project. It is believed Avedesian wanted to keep the payment amounts lower so as not to draw the attention of Craig Avedesian, who routinely inspected FCC's financial records.

In accordance with FCC's request, Exeter submitted Payment Application #5 on May 7, 2015 for payment of $61,458.19. (CC, ¶52). Against Exeter's wishes and request, Avedesian, on behalf of FCC, made direct payment to one of Exeter's subcontractors for $705.00.  Exeter requested that FCC not pay the subcontractors directly because it created confusion with payment applications. Upon information and belief, the direct payment on behalf of FCC by Avedesian was motivated by Avedesian's desire to keep payment amounts for the Project more frequent but lower so as not to attract the attention of Craig Avedesian.

FCC paid Exeter $60,753.19 on May 18, 2015 for Payment Application #5. (Exhibit A). Exeter did not submit a Release with the Payment Application. FCC did not request or require a Release prior to making payment to Exeter. On June 7, 2015, for the first time on the Project, FCC requested Exeter sign a Release. Exeter signed the Release for Payment Application #5 on June 11, 2015, over three weeks after receiving payment. In accordance with FCC's request, Exeter submitted Payment Application #6 on June 14, 2015 for $78,255.00 (CC, ¶55).  Exeter did not submit the Payment Application with a Release. Significantly, this Payment Application included payment for change order work for the first time. FCC did not request or require Exeter to sign a Release. FCC made timely payment on June 29, 2015. (Exhibit A).

Upon information and belief, the tension between Avedesian and Craig Avedesian began to adversely impact the Project in June of 2015. Dennis Ballard of Exeter normally met Avedesian for dinner during the week and golf on the weekends. These activities stopped in June of 2015.  Exeter was proceeding with its work on schedule. Significant progress was made on the building erection and substantial site work was performed on the recently acquired parcels of property to accommodate the additional two story building.

On July 1, 2015, Exeter submitted Payment Application #7 to FCC for $109,085.31. (CC, ¶ 56).  Exeter did not submit a Release with its Payment Application. Payment Application #7 included amounts for FCC's approved change order work. Shortly after submitting this Payment Application, Exeter was notified by its subcontractors that they had been paid directly by FCC. In total, FCC paid Exeter's subcontractors $93,559.43. Exeter voiced its displeasure with FCC over this conduct, once again warning that such actions would create confusion with payment applications. FCC made payment to Exeter for $15,525.88, or the amount remaining on Payment Application #7, on July 17, 2015. (Exhibit A). FCC did not request or require Exeter to sign a Release. FCC assured Exeter it would not directly pay subcontractors in the future.  Payment Application #7 covered all work through June 30, 2015.

Exeter began a significant part of its work on July 1, 2015. It had previously completed substantial site work in preparation for construction of the new two-story building. (CC, ¶ 59). Exeter also ordered significant amounts of concrete, steel, insulation and other building materials in preparation for the upcoming work. (CC, ¶59).

On July 21, 2015, FCC requested Exeter sign two Releases for Payment Applications #6 and #7. Exeter was previously paid in full for both Payment Applications. Exeter's payment was never predicated upon signing the Releases. All three of the Releases were presented to Exeter

well after FCC had already made payment. FCC made payment to Exeter for the change order work prior to a Release being signed.

On July 28, 2015, Exeter was on the Project site coordinating the power washing, painting steel, and preparing the insulation materials recently received. (CC, ¶60). At this time, Exeter noticed its masonry and concrete subcontractor performing work outside the scope of its subcontract. (CC, ¶61). The subcontractor notified Exeter it was performing work pursuant to a new and separate contract it had entered into directly with FCC through President Craig Avedesian. (CC, ¶62). Exeter was unable to contact FCC or Avedesian. On the afternoon of July 28, 2015, Exeter received a letter of termination via hand delivery from FCC signed by Craig Avedesian. (CC, ¶ 63). Exeter had not discussed any aspect of the Project with Craig Avedesian. FCC claimed in its termination letter that Exeter (1) failed to achieve substantial completion by March 30, 2015; (2) failed to pay its subcontractors; and (3) failed to prosecute the work. (CC, ¶64-65).

Avedesian would not return Exeter's phone calls. It is believed and therefore averred that Exeter's termination was related to the ongoing corporate struggles between Avedesian and his brother, FCC President Craig Avedesian. It is believed these struggles were related to the cost of the Project and whether Craig Avedesian agreed with Avedesian's directive to Exeter to construct the second building. (CC, ¶69)

Exeter submitted Payment Application #8 to FCC in August of 2015 for payment of $635, 044.96. (CC, ¶71). For the first time on the Project, FCC refused to make payment on a Payment Application. FCC has also wrongfully refused to release $35,412.15 in retention now owed to Exeter. (CC, ¶70-72). It is undisputed FCC partially paid Exeter on the change orders it orally authorized. Further, FCC did not raise the March 30, 2015 date of substantial completion

until July 28, 2015. At that point, FCC had made payment of $590,141.70 to Exeter *after* the date it claims substantial completion was due without ever raising the issue. Numerous factual issues remain with respect to the signed Releases and course of conduct and performance of the parties.

### III.   <u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 8(a) (2), a plaintiff is required to provide only "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the ….claim is and the ground upon which it rests." *Burch v. Milberg Factors, Inc.,* 662 F.3d 212, 220 (3d Cir. 2011)(citing. *Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957))).

To survive a motion to dismiss, a party is required only to plead "enough facts to state a claim that is plausible on its face." *Renfro v. Unisys Corp.,* 671 F.3d 314, 321 (3d Cir. 2011) (citing *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1322 (2011)). "A plaintiff must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Aschcroft v. Iqbal,* 556 U.S. 662 (2009) (citing *Twombly,* 550 U.S. at 556).

The Court of Appeals for the Third Circuit has clarified that *Twombly* "does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *West Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85,98 (3d Cir. 2010).  "In determining whether a complaint is sufficient, courts should disregard the complaint's legal conclusions and determine whether the remaining factual allegations suggest that the plaintiff has a plausible- as opposed to merely conceivable- claim for relief." *Id.*

Moreover, a court considering a motion to dismiss for failure to state a claim "must accept as true the factual allegations in the complaint." *Langford v. City of Atlantic City,* 235 F.3d 845, 847 (3d Cir. 2000).  The court must construe the facts and reasonable inferences that can be drawn from the facts in the light most favorable to the non-moving party. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994). Furthermore, when deciding a motion to dismiss pursuant to Rule 12(b)(6), the court may only look to the facts alleged in the complaint and its attachments. *Id.* The burden is on the moving part to show there is no actionable claim. *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir. 1980.

## IV.    ARGUMENT

Accepting as true the factual averments in Exeter's Counterclaim, and construing the facts and reasonable inferences that can be drawn from the facts in the light most favorable to Exeter as the law requires, Exeter has clearly pled sufficient facts to state plausible claims for relief against FCC. The Releases attached cannot be properly considered at this stage, and even if they can be, they do not preclude Exeter's claims.

### A.  FCC's Attachment and Reliance on the Releases is Improper and Lacks Merit

A central argument of FCC's Motion is that Exeter's claims are waived by Releases that were signed by Exeter on three payment applications and never as a condition precedent for payment. The Releases fail to support dismissal under Rule 12(b)(6) because (1) they are improperly raised at this time; (2) FCC waived its ability to rely on the Releases; and (3) the Releases are not a condition precedent to payment.

#### 1.  The Releases Have Been Improperly Raised in FCC's Motion

FCC's decision to attach the Releases in support of its Motion is improper because they are not part of the Contract, extraneous to the allegations of the Counterclaim and not integral to

or explicitly relied upon by Exeter in its Counterclaim. *See In re Burlington Coat Factory Sec. Litig,* 114 F.3d 1410, 1426 (3d Cir. 1997) (a document extraneous to a complaint must be integral to or specifically relied upon in the complaint to be considered for a Rule 12(b)(6) motion). FCC's Motion may be appropriately denied on this basis.

FCC's argument that the Releases apply to Exeter's claims constitutes an affirmative defense appropriately raised in an Answer to the Complaint, and arguing its alleged legal effect at this stage requires Exeter to engage in a discussion of facts and defenses to the Releases that are beyond the allegations of the Counterclaim. *See PPG Indus. Inc. v. Generon IGS, Inc.,* 760 F. Supp. 2d 520, 525 (W.D. Pa. 2011) (declaring that a release of claims is an affirmative defense that generally cannot be raised in a motion to dismiss, but rather is appropriately asserted in a responsive pleading); (*In re Adams Gold, Inc. Sec. Litig.,* 381 F. 3d 267, 277 (3d Cir. 2004) (holding that an "affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."). Therefore, the Court should decline to consider the arguments presented in the Motion based upon the reliance on the Releases.[2]

FCC incorrectly relies on the "Third Circuit Rule" to conclude this Court can properly consider the Releases during the motion to dismiss phase. This rule permits a party to submit a release defense by motion if it is apparent on the face of the complaint and no development of the record is required. *Rycoline Proudcts, Inc. v. C & W Unlimited,* 109 F. 3d 883, 886 (3d Cir. 1997).

In this action, the Releases are not "apparent on the face" of this Complaint and a motion to dismiss is not the correct mechanism to resolve the issue. Reliance on the Releases would

---

[2] Notably missing from FCC's argument is that it too filed a breach of contract action. FCC also attached the Contract as an exhibit to its Complaint, yet *did not* attach the signed Releases to the Contract. This is an acknowledgement by FCC that the Releases are not part of the contract despite its argument otherwise.

require the Court to consider other documentation and testimony which would be extraneous to the Complaint. For example, Exeter has submitted seven payment applications, yet only three Releases were produced by FCC. None of the Releases were signed as a condition to providing payment. One of the Releases does not match the corresponding payment application amount because FCC made direct payments to Exeter's subcontractors without Exeter's approval. The Project commenced from September of 2014 through June of 2015 without FCC ever requiring a Release for reasons unknown.

To accept the Releases at this stage of the litigation would require the Court to resolve factual issues which still need to be developed in discovery. Therefore, this Court should decline to consider the arguments presented in the Motion based on the Releases.

### 2. FCC Waived its Ability to Rely on the Releases

If considered appropriate at this stage, FCC has nonetheless waived its ability to rely on the Releases to preclude payment for Exeter's work. Waiver is a voluntary and intentional abandonment or relinquishment of a known right. "Waiver may be established by a party's express declaration *or* by a party's undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary. " *Lydon Millwright Servs. v. Ernest Bock & Sons, Inc.,* 2013 U.S. Dist. LEXIS 65019 (E.D. Pa. 2013) citing *Sabatini v. ITS Amore Corp.,* 455 F. App'x 251, 256 (3d Cir. 2011) *see also Brown v. City of Pittsburgh,* 186 A.2d 399, 401 (Pa. 1962)(noting that waiver requires a 'clear, unequivocal and decisive act' that evidences a purpose to surrender a right'). "A party claiming the benefit of an implied waiver must show that he was 'misled, *to his prejudice,* into the honest belief that such waiver was intended." *Lydon,* at 17, citing *Brown*, at 401.

In determining whether a waiver occurred, courts focus on the conduct of the party that allegedly waived its right. *Id.* The Third Circuit Court of Appeals has held that "ordinarily, the question of waiver is a question of fact for a jury." *Sabatini,* at 256.

FCC argues the three Releases presented and signed weeks after payment was issued bar all of Exeter's claims. [3] FCC's conduct suggests otherwise and a factual inquiry is necessary. Exeter was not required to submit Releases in exchange for payment for the first four payment applications. Further, Exeter's payment was never conditioned upon signing a Release. Exeter's change order work began in Mid-May of 2015 as evidenced in Payment Applications #6 and #7. FCC made payments to Exeter on, *inter alia,* the change order work, on June 29 and July 17.

FCC's payment of the change order work constitutes acknowledgement and acceptance of the same.  FCC's undisputed acts demonstrate its intentions to not rely upon the Releases as a condition for payment or to bar Exeter's change order work.  FCC now implausibly argues signing Releases for Payment Applications #6 and #7 bars Exeter from recovering on Payment Application #8. When Exeter signed the Releases it reasonably and correctly believed (now to its detriment) it was releasing its right to payment on Applications #6 and #7- not for subsequent work Exeter performed merely because it was previously contemplated. Exeter had been partially paid on the additional work and had a reasonable, honest belief that it would be paid to finish the work.

FCC's conduct is clearly a factual issue in determining whether a waiver occurred based on its use of the Releases. The Eastern District of Pennsylvania addressed the issue of implied waiver in a construction context. In *Quinn Construction v. Skanska USA Bldg., Inc.,* 730 F. Supp. 2d 401 (E.D. Pa. 2010), a subcontractor was required to sign releases each time it requested

---

[3] FCC mistakenly asserts that Exeter's claims are only for the additional change order work, when in fact, Exeter's claims also include work originally contemplated by the contract which was delayed because of the change orders.

payment from the general contractor. The release at issue barred the subcontractor's claims for overtime wages. *Id.* at 418. The subcontractor subsequently sued the general contractor for overtime wages. The Court held that while "the plain language of the releases bars the [subcontractor's] claims for overtime wages," they did not entitle the general contractor to summary judgment "because a genuine issue of fact exists as to whether the general contractor waived enforcement of the release language." *Id.* at 418. The *Quinn* Court determined a jury must determine the issue of waiver because, among other things, the general contractor acknowledged the overtime claims after the releases were signed. *Id.* Similarly, FCC has acknowledged Exeter's change order work through payment after the Releases in question were signed and well after the date it claims substantial completion was due.

FCC has waived its ability to rely on the Releases to bar Exeter's claims. In the alternative, because FCC's conduct is a relevant factual issue to determine whether waiver of the Releases occurred, Exeter is entitled to discovery on these issues and FCC's motion is inappropriate.

### 3. The Releases Do Not Act as a Condition Precedent to Payment

FCC argues in its Motion that no payment is due on Payment Applications #8 and #9 because Exeter failed to comply with the Contract's condition precedent to submit a Release with its payment applications. Further, FCC argues Exeter was required to submit a "Subcontractor Release" document. Because no payment is due, FCC argues Exeter cannot maintain causes of action for breach of contract and violation of CASPA. FCC's argument fails because the conduct between the parties waived the submission of the Releases as a condition precedent to payment.

Exeter did not submit and FCC did not require a Release for Payment Applications #1-4. Even when FCC did require a Release for Payment Applications #5-7, Exeter was asked to sign

them *after* Exeter was paid. Additionally, Exeter was never required, requested, or presented with a Subcontractor Release. FCC's argument to avoid Payment on Payment Applications #8 and #9 must fail because it seeks to enforce the Releases as a condition precedent to payment for the first time on the Project.

It is an established principle of contract law that one may waive any provision in the contract, which has been established for his benefit, expressly or impliedly. *North Am. Specialty Ins. Co. v. Chichester Sch. Dist.,* 2000 U.S. Dist. LEXIS 10745 (E.D. Pa. 2000) citing *Formigli Corp. v. William Fox,* 348 F. Supp. 629 (E.D. Pa. 1972.) Conditions precedent may be waived by a party's conduct as long as the intent to waive may be reasonably inferred. *Chichester,* at 57, citing *In re Imaging Equipment Services,* 143 B.R. 355, 359 (W.D. Pa. 1992). For such an inference to be made there must be a "clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender." *Id.* citing *Colonial Penn Ins. Co. v. Bauso,* 1989 U.S. Dist. LEXIS 2112, *aff'd* 882 F. 2d 510 (3d Cir. 1989).

FCC never predicated payment to Exeter based on submission of a release of any kind. It cannot now rely on the Contract provision which it waived and surrendered as a basis to claim Exeter breached the contract and no payment is due. (*Clark Motor Co. v. Mfrs. & Traders Trust Co.,* 360 Fed. Appx. 340 (3d Cir. 2010)("One party to a contract may not request that the other party breach an agreement and then claim a breach of contract on the breach he himself requested")).

The parties' performance established payment without submission of a Release as the regular course of conduct. Exeter has properly pled its claims because payment is due and owing pursuant to the prior performance of the parties. (*Atlantic Richfield Co. v. Razumic,* 390 A.2d 736, 741 (Pa. 1978)(" Course of performance is perhaps the strongest indication of what the

writing means.")); (*See Restatement Second of Contracts 204* ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.")

**B. FCC Cannot Rely Upon The No-Oral Modification and No Change In Work Clauses to Support its Motion**

FCC next argues Exeter cannot allege a breach of contract and CASPA claim because it failed to comply with the Contract's requirements for amending and modifying the Contract. Specifically, FCC claims Exeter's change order work was performed in violation of the No Oral Modification ("NOM") and No Change in Work ("NCW") clauses in the contract and fails because it was performed without an executed change order form. As such, Exeter' date of substantial completion remained March 30, 2015 and FCC properly terminated Exeter for failure to achieve substantial completion. FCC asserts Exeter is not entitled to payment for the additional work because it was performed at its own risk without a written change order.

FCC's argument fails because the provisions it relies upon were altered by subsequent agreements supported by valid consideration evidenced by FCC's payment upon those subsequent agreements. Further, FCC's argument fails because the conduct of the parties demonstrates FCC's waiver of these provisions. FCC cannot direct Exeter to perform change order work, begin payment upon it, and later claim Exeter performed the work at its own risk and refuse further payment.

**1. The No-Oral Modification and No Change In Work Clauses Were Validly Altered and/or Waived**

A contract clause prohibiting oral modification may itself be altered by subsequent oral agreements. *2101 Allegheny Assoc. v. Cox Home Video, Inc.* 1991 U.S. Dist. LEXIS 15542 (E.D.

Pa. 1995). There are two specific criteria which must be met for an oral modification to be valid. *Id.* A written agreement can be modified by a subsequent oral agreement "provided the latter is based upon a valid consideration and is proved by evidence which is clear, precise and convincing." *Id.* citing *Bonczek v. Pascoe Equipment Co.,* 450 A.2d 75,77 (Pa. Super. 1982)(*see Prusky v. Phoenix Life Ins. Co.,* 2005 U.S. Dist. LEXIS 32856 (E.D. Pa. 2005)("Once a contract has been formed, its terms may be modified if both parties agree to the modification and the modification is founded upon valid consideration"), *GE Capital Mortgage Servs. v. Pinnacle Mortgage Inv. Corp,* 897 F. Supp. 842 (E.D. Pa. 1995)("Every agreement, no matter how firmly drawn, may always be modified by another agreement. Even a formal agreement which expressly states that it cannot be modified except in writing is subject to modification by oral agreement since the requirement for a writing is itself subject to modification.")

Further, Pennsylvania law recognizes that no-oral modification provisions are waivable by the conduct of a party to the contract. An agreement that prohibits non-written modification may be modified by a subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing. *Std. Steel, LLC v. Buckeye Energy, Inc.* 2005 U.S. Dist. LEXIS 22378 (W.D. Pa. 2005).

The conduct of Exeter and FCC demonstrates clear and convincing evidence that the NOM and NCW clauses in the contract were modified and/or waived by the parties' subsequent oral agreement and actions. First, FCC's directive to expand upon the originally intended construction is evidenced by its purchase of additional land to accommodate the expansion. (CC, 26-28 ). Based upon FCC's directive and purchase of additional property, Exeter nearly doubled its order of materials to construct the additional building, and submitted four change orders which extended the date of substantial completion to February 9, 2016. (CC, ¶ 43-44 ). While

these change orders were not signed, they were orally approved and paid upon by FCC.  Exeter and Avedesian spoke of the additional work, cost, and time required due to the expansive changes. (CC, ¶ 30, 40) Exeter began work upon the change orders in May of 2015 and FCC first made payment for the change order work in June of 2015.

The parties' actions and conduct support a finding that they validly orally modified the Contract and that the Project was subsequently substantially expanded upon. The modification was founded upon valid consideration, as Exeter performed upon the change orders and FCC began payment.  FCC's acceptance of the change order work by payment took place *after* March 30, 2015- the date FCC now claims Exeter's substantial completion was due. FCC never raised March 30, 2015 as the date of substantial completion until it wrongfully terminated Exeter on July 28, 2015 (CC, ¶ 26-28 ). In fact, of the $879,921.45 of work completed through Payment Application #7, $590,141.70 was completed and paid *after* the date FCC now claims substantial completion was due, $100,000.00 of which was for change order work.

Despite FCC's contentions otherwise, the NOM and NCW clauses were modified and/or waived by the conduct of the parties and the receipt of valid consideration by both parties. Neither of the clauses relied upon by FCC precludes Exeter from maintaining its breach of contract and CASPA causes of action at this stage of the litigation. FCC wrongfully terminated Exeter from the Project and payment is due and owing on Payment Applications #8 and #9.

### C.  Exeter's Unjust Enrichment Claim is Proper

FCC next argues that Exeter cannot sustain an unjust enrichment action because the parties' relationship is governed by an express contract, the existence of which limits Exeter's remedy to breach of contract. This argument fails because federal law and Pennsylvania law allow Exeter to plead both causes of action at this stage of the case. Furthermore, FCC's

argument fails because the enforceability of the contract has been challenged. FCC's argument to dismiss Exeter's unjust enrichment claim is only applicable in cases where the existence of a valid contract in all respects is undisputed.

Federal Rule of Civil Procedure 8 explicitly states that "a party may state as many separate claims or defenses as it has, regardless of consistency. *FRCP 8(d)(3),see Indep. Enters. Inc. v. Pitt Water & Sewer Auth.,* 103 F.3d 1165, 1175 (3d Cir. 1997). While Exeter may not ultimately recover on both a breach of contract and an unjust enrichment claim, it "does not impugn the well settled principle that under both federal law and Pennsylvania law a plaintiff may plead both." *Alpha Pro Tech v. VWR Int'l LLC,* 984 F. Supp. 2d 425 (E.D. Pa. 2013), *citing Lugo v. Farmers Pride, Inc.,* 967 A.2d 963, 969-970 (Pa. Super. Ct. 2009).

FCC's argument assumes both parties agree that the Contract, as written, validly governs all aspects of the relationship between the parties. Clearly this is a disputed issue, as FCC asserted certain provisions of the contract preclude Exeter from recovery while Exeter asserts certain provisions in the contract are inapplicable due to modification and waiver. Because the terms of the contract are in dispute, Exeter has properly pled an unjust enrichment cause of action. *See Bill Goodwin Constr., LLC v. Wondra Constr. Inc.* 2014 U.S. Dist. LEXIS 49652 (M.D. Pa. 2014) (Holding the Plaintiff was not foreclosed from pleading  breach of contract and unjust enrichment when the parties disputed alleged oral agreements and oral modifications of the contract; Court denied Defendant's motion to dismiss both counts.);  *See also Halstead v. Motorcycle Safety Found, Inc.,* 71 F. Supp. 2d 455, 459 (E.D. Pa. 1999)(" While Pennsylvania law precludes **recovery** on an unjust enrichment claim when a valid contract exists, plaintiffs are free to pursue alternative theories of recovery); *See Reynolds v. Univ. of Pa.,* 747 F. Supp. 2d

522, 541-542 (E.D. Pa. 2010) ("the contract must be found to be enforceable for an unjust enrichment claim to be excluded.")

Because the existence of a valid contract to govern the relationship of the parties in all respects is currently in dispute, Exeter may properly plead an unjust enrichment cause of action at this time.

## V.   CONCLUSION

For all the above reasons, Exeter respectfully requests that the Court enter an order denying FCC's Motion to Dismiss. In the alternative, should the Court require additional information on FCC's improperly attached and relied upon Releases, Exeter respectfully requests leave to amend its claims.

Respectfully Submitted,

*/s/ Robert M. Palumbi, Esq.*

Dated:   May 2, 2016

D. Matthew Jameson III, Esq.
PA ID No. 67764
Robert M. Palumbi Esquire
PA ID No. 307774
Babst, Calland, Clements and Zomnir, P.C.
Firm PA ID No. 812
Two Gateway Center, 7th Floor
603 Stanwix Street
Pittsburgh, PA  15222
412.394.5400
Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2016 I electronically submitted the foregoing document to the Clerk of the Court for the United States District Court for the Western District of Pennsylvania, using the electronic case files system of the Court.  The electronic case files system sent a "Notice of Electronic Filing" to the following individuals who, by rule, have consented to accept the Notice as service of this document by electronic means:

        Jason L. Richey, Esquire
        William Wickard, Esquire
        K&L Gates LLP
        K&L Gates Center
        210 Sixth Avenue
        Pittsburgh, Pennsylvania 15222

        *Counsel for Plaintiff Federal Carbide Company*

                        */s/ Robert M. Palumbi, Esq.*